THE STATE v. HUNTER ALBRITTON and ORVILLE TAYLOR, Appellants. —40 S. W. (2d) 676.

Division Two, July 3, 1931.

350

*Ralph E. Bailey* and *M. G. Gresham* for appellants.

354

*Stratton Shartel,* Attorney-General, and *Denton Dunn,* Assistant Attorney-General, for respondent.

358

WHITE, P. J.—In the Circuit Court of Butler County, October 21, 1929, the defendants were found guilty of robbery in the first

degree and each of them sentenced to a term of twenty years in the penitentiary. Both defendants appealed.

Thursday, February 21, 1928, a Buick automobile with wire wheels, described by different witnesses as "red," "cherry color," and "wine color," left Tulsa, Oklahoma, containing the two defend-. ants and one Fred Hurst. The automobile belonged to Isabel Howard, who loaned it to the three men to drive to Missouri. Defendant Orville Taylor's father lived at Sikeston, Missouri, in Scott County. Defendant Albritton had a brother living in Sikeston. On the Sunday following that date and also on days before and after, the automobile was seen at various places in Scott and neighboring counties. Defendant Taylor testified that they went to Canalou, in New Madrid County, where his father-in-law lived. Later they were at Sikeston.

The following Thursday, February 28th, about two P. M., that automobile with three men in it stopped in the street in Qulin, Butler County, near the Bank of Qulin. One man remained in the car while the other two went into the bank, held up the cashier, Irvin Waller, and took from him more than $2100, the money of the bank. The two then got in the car and it sped away to the north.

Qulin is about fifteen miles southeast of Poplar Bluff in the southeast corner of Butler County. Highway No. 60 runs from Poplar Bluff eastward through the towns of Dudley and Dexter in Stoddard County and on to Sikeston in Scott County. The robbers apparently attempted to avoid the traveled highways as much as possible; they drove straight north from Qulin, intercepted Highway No. 60 at Log Cabin, a little west of Fisk, about ten miles east of Poplar Bluff, drove east on Highway 60 to Dudley in Stoddard County, seventeen miles from Poplar Bluff. There they turned off the highway sharply to the north. News of the robbery spread over the country. Dr. Greathouse at Fisk heard of it. He testified that he and two other men went to Log Cabin and as the red Buick car passed with three people in it he shot at it and the occupants of the car shot back four times.

J. B. Buchanan, a deputy constable running a filling station at Fisk, was with Dr. Greathouse at Log Cabin and testified to the same incident. Those witnesses pursued the red car, but before they could overtake it they went into a ditch.

About 3:30 or four o'clock that afternoon that red car was stuck in the mud in a country road about ten miles west of Bloomfield, and between Bloomfield and Puxico, in Stoddard County. It was pulled out of the mud by Carlos Potter. Later the red automobile was found abandoned, sitting behind an old schoolhouse between Bell City in Stoddard County and Morley in Scott County. The

tracks of three men led from it toward a woods where two suitcases were found, one of which contained shirts with the laundry mark "H.A." on the pockets and shirts with the mark "O.T.," a shaving mug with the name "Jake Taylor" on it, also a razor and neckties. It is not disputed that the robbery as described was perpetrated by men who came to the bank in the same red car which bore the defendants from Oklahoma to Missouri, nor that Hurst was one of the robbers. Defendants contend that they were not there at the time of the robbery.

The cashier of the bank, Irvin Waller, was asked if he knew who came in the bank and forced him to put up his hands. He said he thought it was Hunter Albritton. Objection to that was sustained and he was asked if he *knew* who it was. He said, "Yes, it was Hunter Albritton, and the other fellow was Orville Taylor." He described the red Buick car with wire wheels. One O. F. Dickey, who passed the bank at the time the robbery was going on, saw the red automobile with wire wheels, and a trunk on the back. He saw the two men come out of the bank, run down the walk and get into a car and drive away fast. One of the men strongly resembled Hunter Albritton.

John Litzler, who kept a filling station at Dudley, seventeen miles east of Poplar Bluff, testified that about 3:30 February 28th he heard of the Bank of Qulin robbery; that an automobile with three men in it passed through Dudley going east and turned a square corner (north) at a high rate of speed. About 12:15 of that day, before the robbery, the same car stopped and the occupants bought eight gallons of gasoline from him. It was a red Buick with wire wheels and had a trunk on the back. One man sitting in the back seat had a gun in his pocket. They paid him in silver and didn't wait for the change. He had seen these same people the evening before when they had bought gasoline; *two of the men were the defendants.* No other car of that description passed his garage.

Hunter Langford testified that on the afternoon of the day of the robbery, on a road which went into Highway 60, he saw a car of that description going east with the two defendants in the car. They asked about the road. They wanted to get in the road to Bloomfield and went that way.

Eff Kelley of Bloomfield testified that he heard of the robbery in the afternoon of the day it occurred and was asked to watch for the robbers. He saw the red car with wire wheels pass about four P. M. going east; he fired at it and glass fell in the road. He got within fifteen or twenty feet of the car and one of the defendants was in it, although he was not positive about the identification.

John Morgan, who lived on the road from Puxico to Bloomfield,

testified that about 3:30 or four o'clock on the day of the robbery one of the defendants came to him and asked him to bring his team and get the man's car out of a mudhole; he went, and when he got to the place Carlos Potter already had pulled the stalled car out. One of the defendants paid him two dollars for bringing his team down and said, "We have no use for you now." Witness walked a few steps towards the car and one of the defendants said with an oath, "I told you we did not need you down here." He saw the defendants at the preliminary hearing and they were the same men that were at the red car that day. It was Orville Taylor who paid him the two dollars.

Roy McCown, Deputy Sheriff of Stoddard County, testified that he heard of the robbery, set out east on Highway 60, and saw the red car going sixty-five miles an hour, but he had an accident and could not follow it. Afterwards he got the car from the Stoddard County officers and saw blood on the car at the rear end, and a glass had been shot out.

E. A. Dye, former sheriff of Scott County, testified to the contents of abandoned suit cases, and said that Jake Taylor was the father of Orville Taylor.

Allen Hennard testified that on the night of the bank robbery three men came to where he was, about a mile west of the schoolhouse where the red car was abandoned, and asked him to take them to Crowder. Two of the men had the arms of the other around their necks, helping him along as they walked.

The defendants were arrested in Los Angeles.

Orville Taylor testified on his own behalf that he borrowed the red Buick from Mrs. Howard, and drove with Hurst and Albritton from Tulsa, Oklahoma, to Missouri; that he stayed at the home of his father-in-law at Canalou until Sunday night before the robbery; that then Hurst came and took him and his wife in the car to his father's home in Sikeston, and then Hurst drove away, and he had not seen the car from that day. He had shaved, using a mug with his father's name on it. He stayed at his father's house until Tuesday morning and then visited his brother, Walker Taylor, came back that evening, and left for New Orleans the next morning about 2:30. He said he did not rob the Qulin Bank.

Hunter Albritton did not testify. John Albritton, his brother, testified that Hunter Albritton came to his home Wednesday night before the robbery. He stayed there Wednesday night and Thursday night and left early Friday morning. He bought a ticket for St. Louis. Witness got a card from him the following Thursday postmarked "Cleveland, Ohio."

Defendants introduced other evidence tending to corroborate their

theory that they were not with the red car but were elsewhere at the time of the robbery.

The motion for new trial assigns a number of errors, mostly relating to the introduction of evidence.

I. It is claimed that there was no substantial evidence to sustain the conviction. From the facts set out above the evidence was ample to make a submissible case. Defendants were identified several times in connection with the robber's car at places where, if innocent, they could not have been.

II. It is further claimed that the verdict is based upon instructions on robbery in the second degree whereas the defendant was charged with putting the cashier in fear of immediate danger with a dangerous and deadly weapon. The instruction authorizes a finding of robbery in the first degree and such was the verdict.

The argument runs that there were two ways of charging robbery in the first degree; that both ways were charged in the information and that the court erred in overruling appellant's motion to quash and its motion to have the court require the State to elect upon which specific charge it would go to trial. The information charges in the usual form that the defendants made an assault upon Irvin Waller, the cashier of the Bank of Qulin, and took $2500 in lawful money of the United States, property of the said bank "from the person in the presence and against the will of the said Irvin Waller then and there by force and violence to the person of the said Irvin Waller and by putting the said Irvin Waller in fear of some immediate injury to his person."

Section 4058, Revised Statutes 1929, defining robbery in the first degree, describes the different ways by which that offense may be committed, connecting the different methods by the alternative "or." The information charges that it was accomplished by all those methods. All that could be true. If the evidence tended to show that the robbery was accomplished either one way or the other where both methods were charged, a case was properly made out and it was not error to overrule the motion to quash or the motion to elect.

III. It is claimed that the court erred in permitting Irvin Waller to say "I think" when he identified the defendants as committing the robbery. When asked if he knew the two men who came into the bank he answered "I think so." Then when asked who they were he said, "I think they were those two fellows,"

pointing to the defendants. Objection to that identification was sustained. He was then asked if he knew Taylor and Albritton. He said only by hearing their names since the robbery. He knew the parties called by those names. He then was asked who came to the window and told him to put up his hands. He said he thought it was Hunter Albritton. Objection to that was sustained. He then was asked if he knew who it was. His answer was, ''Yes, it was Hunter Albritton.'' There was no objection to that answer to the question. It was positive and direct after the court had excluded his mere ''think so.'' We are unable to find any error there.

Error is assigned to allowing questions in several instances to which there were no answers and therefore no evidence to object to. It is unnecessary to go over those in detail. Error, it is claimed, was committed in admitting the testimony of four witnesses as to the contents of the suit cases found quite a distance from the abandoned car. This evidence was properly admitted. Orville Taylor testified that he and Albritton with Hurst came to Missouri in Mrs. Howard's car, describing some of their movements after they got to Missouri; that he used the shaving mug with his father's name on it— the mug which was one of the articles found in the abandoned suit cases. That car was abandoned and the tracks of three men led from it to the place where these suit cases were found. The three men who had been in the car were identified as the defendants and Hurst, and the articles in the suit cases bore marks which indicated that they belonged to the defendants.

The defendants' counsel in cross-examination of Raymond Begley, witness for the State, asked if he knew what officer subpoenaed him. Objection by the State was sustained and error is assigned to that ruling. It is said that the question was asked for impeachment purposes, but defendants made no offer to prove what would be shown by such examination. The court cannot be charged with error on that account.

IV. Numerous errors are assigned to the action of the prosecuting attorney and the failure of the court to rebuke him at times. The objections in most instances were sustained and no rebuke was asked. Error is assigned to permitting witness McCown to testify as to where the defendants' folks lived. It was a proper subject of inquiry. Defendant Taylor testified to his movements and to his purpose in coming to Missouri. The residences of the families of the relatives of the two defendants were facts showing the surrounding circumstances.

364

When John Albritton testified that he received a post card postmarked Cleveland, Ohio, February 28th, from his brother Hunter Albritton, he was asked what was said on that post card. This was excluded, and properly. Whatever it might have said was pure hearsay. The post card itself, if offered, would have been incompetent as to any statement of fact on it, because hearsay. The fact that witness got the post card was all that was competent.

W. H. Warner, father-in-law of Orville Taylor, on cross-examination was asked about the movements of his son-in-law Orville Taylor, and if he read about the Qulin bank robbery. He answered that he read about it the next week. Asked if he learned that his son-in-law was accused of participation in the robbery, he said that he saw that in the paper later on. Asked when he saw it he said he saw it the middle of the next week. Asked if the newspaper article carried his son-in-law as one of the robbers, he said he believed it did, he would not be sure. Then an objection was made. The defendant waited until the witness said everything he had to say or that was asked of him before making an objection. There was no motion or request that the court exclude from the consideration of the jury the evidence already in. The court cannot be charged with error for permitting the witness to answer questions which were not timely objected to.

When Jake Taylor, father of Orville Taylor, testified at length about the movements of his son he was asked if he had heard that his son was accused of the robbery. He said he learned it later on. He said he made no effort to locate his son when he knew the officers wanted him for robbery. This was objected to and its admission assigned as error. Great latitude is allowed on cross-examination, and this was not improper as going to the credibility of the witness.

V. Error is assigned because the court refused to permit appellants to interrogate Orville Taylor about a letter in Hunter Albritton's handwriting, postmarked Los Angeles, California. The question went to the contents of the letter. There was no showing that the letter was lost or was inaccessible, and no date of the letter was mentioned, and nothing to indicate that it would be relative to any issue. No error is shown. Besides there was no offer of proof. No error is in the ruling.

VI. Error is assigned to the refusal of the court to furnish a panel of thirty men from which to select the jury, on the theory that under Section 3674, Revised Statutes 1929, where an offense punishable with death is charged the defendant shall have twelve challenges and the State six. The in-

formation might have charged robbery committed by means of dangerous and deadly weapons, under Section 4061, for such weapons were used, but it simply charged robbery in the first degree under Section 4058, and the case was so submitted. The jury could not have been authorized to inflict the death penalty. The defendants, therefore, were not entitled to a panel of thirty.

VII. Complaint is made of improper remarks made by the prosecuting attorney. At one time Mr. Cope, for defendant, made this objection: "We object at this time to counsel laying this gun out here." There was no showing that any such gun was laid out. The court said, "I eliminated the gun; it isn't in the case."

At another time Mr. Cope objected to the statement of the prosecuting attorney that Hunter Albritton said, "I am afraid of this man Litzler, and we'll just go back through Dudley and see if he recognizes us." The court said the argument was improper and directed the jury to disregard it. The court did not abuse its discretion in failing to reprimand the State's counsel.

Mr. Cope again objected that Mr. Kearby for the State had said Mr. Gresham and his private secretary could go behind closed doors and make any kind of testimony. The record did not show that counsel made any such statement. The court, however, instructed counsel not to make prejudicial arguments.

Again Mr. Cope objected when the prosecuting attorney mentioned the poor fellow (Mr. Hurst) as going down and killing himself and his sweetheart and laying the blame on him for robbing the bank. The court referred to that remark as made in the opening statement, instructed the jury to disregard it, and admonished Mr. Kearby to avoid prejudicial arguments. It was within the discretion of the court to refuse to discharge the jury.

Mr. Cope again objected to a statement of the prosecutor that for a year or more the defendants were fugitives from justice. The court overruled the objection, saying it was a question for the jury to determine. The evidence shows that the defendants left Missouri as hurriedly as they could after the bank robbery—one of them the day after, and the other, he claimed, the day before. It was notorious and in the newspapers that these defendants were thought to have committed the crime. They were found in Los Angeles and were there arrested. It was a question for the jury whether they had fled from Missouri.

Other remarks were made by the prosecuting attorney to which objections were sustained.

Mr. Gresham for the defense, while making his closing argument,

said that if there was anything wrong with those defendants or their witnesses "the State of Missouri should have had witnesses here to show it." Mr. Tedrick for the State objected on the ground that the law didn't permit the State to impeach the defendant unless he takes the witness stand. The court sustained the objection. The ruling was not improper. Other objections were made where no exceptions were saved. Others were overruled where the court said the prosecuting attorney was replying to the defendants' argument.

We find no error in any of the incidents.

VIII. Error is assigned to the giving of several instructions. It is said that Instruction No. 1 was erroneous because it left out the theory of the defense. The only defense was an alibi, and another instruction properly and fully directed the jury in regard to it. No error.

Instruction No. 2 on reasonable doubt is in the usual form closing thus: "If upon consideration of all the evidence you have a reasonable doubt of a defendant's guilt you should acquit such a defendant," etc. It was objected that it did not distinguish which defendant. It meant a defendant in regard to whose guilt the jury entertained a reasonable doubt. It might be either or both. Defendant offered no instruction making more specific that direction to the jury and has no reason to complain.

Instruction No. 4 upon alibi closed in this way: "Now if the evidence leaves in your minds a reasonable doubt as to the presence of said defendants, or either of them, at the place where the offense was committed," etc. The objection is to the use of the expression, "if the evidence" instead of "if upon consideration of all the evidence." Mention of the evidence means all or any of the evidence which would bear upon the feature of the case. The jury could not be misled by it.

It is further asserted that the court should have instructed the jury as to the weight and value to be given depositions which were read on behalf of defendant Hunter Albritton. In the voir dire examination of the panel, jurors were asked if they would give the testimony of witnesses taken in Cleveland, Ohio, the same weight and value they would give it if the witnesses were present. The court said that testimony is subject to the same test as any other testimony and is to be weighed by the same rule as any other testimony. A juror then said he would give it the same value. If defendants wished a written instruction submitting to the jury that subject they should have asked it. It was a collateral matter. The failure to give it, without such request, was not error.

IX. Appellants claim error in the court's refusal to grant new trial on the ground of newly discovered evidence, the motion for new trial being supported by the affidavits of witnesses who could be procured for new trial. One of those witnesses, Herbert Arnold, swore that he was subpoenaed to appear at the trial but didn't go; that he told "them" (meaning probably defendants or defendants' attorneys), he didn't know anything about it and "they" let him off. Tilford West swore that he was subpoenaed, but did not attend the trial and didn't tell what he knew to Albritton or Taylor, nor to their attorneys.

The first witness admitted that he lied to them and the second admitted that he concealed his knowledge. These two witnesses are now put forward by the defendants as truthful witnesses. Besides, all they stated in their affidavits is merely cumulative, tending to support the alibi offered by defendants. West also put into his affidavit a conversation he had with Hurst whose name he mentions as Hurt; a conversation which was purely hearsay and incompetent.

Marvin Mickle, another witness whose affidavit is attached, swore that he knew of facts which tended to support the defendants' alibi. He related a conversation between himself and Mayberry (another name for Hurst), pure hearsay and incompetent. He also said that he concealed what he knew before the trial.

J. D. Hazel's affidavit states facts tending to support the alibi, cumulative evidence. He swore that he concealed what he knew until after the trial "because I did not want to get someone else in trouble."

The affidavit of Isabel Howard, owner of the automobile, which was borrowed from her in Tulsa and used by the robbers in committing the crime, is attached to the motion. She swore to some undisputed facts about the lending of the automobile to Albritton and Taylor and said that Hurst was to bring it back. She then swore that after the robbery some parties claiming to be detectives came to her place and threatened her if she did not say that Albritton and Taylor stole her car. This matter was entirely irrelevant. She mentioned nobody making these threats who was connected with the case.

All the newly discovered evidence was cumulative or hearsay or otherwise incompetent. Besides, as to those witnesses who were at all times accessible to defendants and lied about what they knew or concealed their knowledge, no sufficient diligence is shown, no attempt to find out what they knew.

X. Other errors are assigned, but they are not sufficiently specific or not of sufficient importance to merit consideration. The defense

368

was most strenuous. Throughout the trial of the case every imaginable point that could be made by the defendants was made. The court was called upon to rule repeatedly upon objections which were not well founded and only added to the trouble and confusion of the trial. The trial court throughout maintained a fair and just attitude towards the parties, and no reversible error was committed.

The judgment is affirmed. All concur.