THE STATE v. AL ROSE, Appellant.—96 S. W. (2d) 498.

Division Two, August 20, 1936.

*Rouark & Rouark* for appellant.

318

*Roy McKittrick*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant and one E. E. Griffith were charged by information under Section 4446, Revised Statutes 1929 (Mo. Stat. Ann., p. 3052), as accessories before the fact to a robbery in the first degree perpetrated upon one Ross Keeling in Newton County on November 22, 1934, by G. C. McDaniels, Samuel L. Hosp, John Harrison and Ernie Tennison. A severance was taken and during the trial of the case against the appellant, Rose, a *nolle prosequi* was entered as to Griffith. That the robbery occurred was not disputed, the only issue of fact being whether the appellant had anything to do with it. The appellant was convicted by a jury and his punishment assessed at imprisonment in the penitentiary for a term of five years. His brief assigns error in the denial of his motion for new trial on the ground of newly discovered evidence; in the admission of incompetent evidence; and the improper curtailment of appellant's cross-examination of his alleged accomplice, Griffith, who became a witness for the State.

It is unnecessary to detail the facts of the robbery except to say it occurred at night on a dairy farm about five miles from Neosho, and that the robbers professed at the time to have knowledge of the amount of money that Keeling and his hired man, Lynn, had on hand. They insisted that Keeling had $1500 and Lynn had $2000 somewhere about the place and said, "We know what we are doing." They declared they had been told more money was being kept there on the farm than the $600 they got. The accomplice and State's witness, E. E. Griffith, was engaged in selling hot tamales and pies in Neosho, and had bought milk and ice cream from Keeling for quite a while up to about two months before the robbery. Keeling also had known for three or four years the appellant, Rose, who was a barber in Neosho.

Hosp, one of the robbers, testified that two days before the robbery McDaniel, another of the robbers, and a man named Brookshire, met at his home in Joplin. McDaniel wanted to go to Neosho to see somebody. The witness, Hosp, drove them over there in his automobile. They parked near a barbershop across the street from the jail and McDaniel went into the shop. He was gone only a few minutes. The appellant was working on a man in a barber chair. He stood at the door as McDaniel left and the witness heard him say, "I'll see you tomorrow." This occurred just before the noon hour.

The next day the witness again drove McDaniel and Brookshire

from Joplin to Neosho and parked the car near the same barbershop. McDaniel went into the shop and had another conversation with the appellant. He returned in ten or fifteen minutes and they then went to another part of town and picked up Griffith. Thence they drove out into the country past Keeling's farm. Griffith was taken along, the witness stated without objection, "to show us where the place was, and tell us what we were to do." As they went past the Keeling place Hosp drove slowly and Griffith laid down in the bottom of the car. It was about midday. That night the robbery was committed. Over the appellant's objection and exception the witness was permitted to testify that in the division of the booty $70 was set aside for the appellant and Griffith, McDaniel taking charge of it. The appellant was not present at any of these times, his only connection with the crime (if any) arising through his two conversations in the barbershop with McDaniel, so far as Hosp's testimony discloses. The witness admitted several former convictions of crime. McDaniel did not testify.

Brookshire corroborated Hosp by testifying he was with the latter and McDaniel when they drove from Joplin to Neosho the day before the robbery and McDaniel had a brief conversation with the appellant in the barbershop across the street from the jail. He said the appellant was in the shop at the time. He further testified that on the next day he was with Hosp and McDaniel when they again drove to the barbershop and McDaniel went in and remained a few minutes. Then they picked up Griffith at another place in Neosho and he went out in the country with them to show them the place where Keeling lived. The witness was asked, "you were going to rob it?" and he answered without objection, "Well, Hot Tamale went out to show us where it was—where there was some money." (The record shows that Griffith went by the name "Hot Tamale.") This witness, Brookshire, was not present when the robbery was committed and the money divided. His testimony connects the appellant with the crime only insofar as that connection may appear from his statement that the robber McDaniel had the two conversations in the barbershop with the appellant the day before and on the day of the robbery.

Brookshire left the stand and the appellant's alleged accomplice and codefendant Griffith was called as a witness. On appellant's objection that Griffith was not a competent witness because he was jointly charged with appellant in the case, the prosecuting attorney directed him to leave the stand and wait outside. Then the witness Brookshire was recalled and testified without objection that he was in jail charged with complicity in the robbery involved and had pleaded guilty to the charge. Thereupon Griffith was recalled as a witness. The bill of exceptions does not show it, but it appears to be

conceded that the prosecutor had in the meantime (after appellant's counsel had made objection and he left the stand) entered a *nolle prosequi* as to him. The record proper shows that the case was dismissed as to Griffith on the date of the trial.

The witness Griffith testified that he had talked with the appellant about the robbery of Keeling several times in Biff Smith's barbershop where the appellant was working. The appellant asked Griffith if he knew anyone that had any money and Griffith told him Keeling was the only man he knew of. The witness stated he passed the barbershop daily and the subject was brought up every time he went by. The appellant said he could get someone who would "get the money for us." Then the prosecuting attorney asked the witness this question, "Did he get someone?" and the witness answered, "Yes, he got someone." After the question was thus answered appellant's counsel interposed, "I object to that," but it does not appear that the court ruled on the objection.

Then the witness continued: "He sent two men. They came to see me." And he further stated appellant told him these two men "would do the work." He was then asked the question "Well, did they pull the job?" and he answered "yes" without objection. At this point the testimony of the witness is a little confusing, but as we understand it he stated that he was afraid to trust the first two men who came to him and so told the appellant. Then the appellant referred the witness to two other men who were sitting in an automobile by the side of the barbershop and said they would do the job. The witness talked to them but they did not do it.

Then the witness was asked, "Did he finally get someone to do it?" and the witness answered, "He did." Appellant's counsel objected to this question and answer because they called for a conclusion of the witness and the objection was sustained by the court. But the witness continued, "The three men are all here. He got three." An objection that this statement was voluntary was overruled. Summarized and reduced to narrative form his testimony continued. These three men came to me. I went out with them and showed them where Ross Keeling lived. I had a conversation with the appellant about these three men. He told me there would be three men that would come out to see me; that they were real men who would do the job and not hurt any one. They did come to see me. They drove up and wanted me to get in the car with them and go out and show them where Keeling lived, and I did. The robbery took place a mighty short time after that.

I had a conversation with the appellant after the robbery. The robbers had not brought our part of the money in. Hosp, McDaniel and Brookshire had talked to me about that when I took them out to see Keeling's house. The appellant told me we ought to

get ten or twenty per cent out of the robbery. After the robbery he asked me if they had brought me any money. He came down the second morning and inquired if anyone had brought me any money yet and when I told him no he said, "I told them to bring the money and deliver it to me today." It was not brought. In a further conversation he said he would go to Joplin and see "the fellow" and get the money, but he reported that he did not see the man. The witness testified it turned out he did not get any money out of the robbery and did not know whether the appellant did. He further stated the appellant paid his expenses to Joplin to collect their part of the robbery money and the witness says he did go on a freight train but did not find any one. In a later conversation the appellant told him he still had not received any money and that the robbers had been arrested. The day before the appellant's trial he approached the witness and asked him how he was going to swear. The witness said he informed the appellant that he had decided to tell the truth about it and the appellant answered, "You will just get yourself in bad. I would beat it."

On cross-examination the first question asked Griffith by appellant's counsel was, "You saved your hide by testifying, didn't you, Hot?" An objection by prosecuting attorney that the question was improper was sustained. Then appellant's counsel said, "We offer to prove by this witness that this case has been dismissed against him so that he will testify against Al Rose" (the appellant). The court refused the offer but said, "You can show that the case has been dismissed, if you want to." The witness was then asked, "Didn't you get mad at him (the appellant) when you went to him to go on your bond when you were charged with running a bawdy house and he refused?" The prosecuting attorney objected that the question was improper and counsel for appellant then said, "I offer to show by this witness that he has a feeling against the defendant because he refused to sign his bond." The court ruled, "It will be refused. You cannot show the purpose of it, or the reason for it." The witness further testified on cross-examination that he knew Keeling generally carried "right smart money;" that he had seen it in his pocketbook; and that Keeling fell out with him about two months before the robbery.

The appellant did not testify but made an unsworn opening statement to the jury as follows. Gentlemen of the jury: "They have got me charged here with something I don't know a thing in the world about. I never was accused of a crime in my life. I never was at Keeling's place in my life, never had a talk with him and absolutely know nothing about it. I never was in the shop down there at the time they say I was. I think the evidence will show that I wasn't. That is about all I have got to say. Thank you."

The general reputation of the witness Griffith for truth, veracity and morality was impeached by Joe Thurman, chief of police, and Tom Cunningham, night watchman, of Neosho; also by Gene Boyd, a livestock dealer, and H. O. Buchanan, a former deputy sheriff, of Newton County. Capt. E. J. Mower, owner of the barbershop in which the State's evidence placed the appellant at the time he had the alleged conversations with the robber McDaniel, and the accomplice Griffith, testified that appellant did not begin working in that shop until November 26, according to his books and his memory as refreshed thereby, this being four days after the robbery. He said a barber named Norman Brock operated the shop up to that date.

I. Appellant's first assignment is that the court erred in refusing to grant a new trial on the ground of newly discovered evidence. It will be remembered that the witnesses Hosp and Brookshire testified that the robber McDaniel had a conversation with the appellant in a barbershop across from the jail on November 21 and November 22, 1934, these being the day preceding and the day of the robbery. Also, the witness Griffith testified to having several conversations with the appellant in "Biff Smith's" barbershop several times shortly before the robbery. The record does not make it clear, but we understand this is the same barbershop referred to in the testimony of Hosp and Brookshire. On the other hand the appellant produced as a witness Capt. Mower, the owner of the barbershop, who testified the appellant did not begin to work there until November 26, which was four days after the robbery.

In his motion for new trial the twelfth ground alleged is that he had just discovered that Norman Brock would testify that he (Brock) was personally present and operating said barbershop on November 21 and November 22, and that the appellant was not in said shop at any time on those dates, or any other date prior to November 26. The motion further alleged that Mrs. H. D. Beatty would testify she operated a restaurant adjoining said barbershop on November 21 and November 22; that Norman Brock was operating the shop on those dates; and that the appellant was not in or around the barbershop at any of these times, but started to work there on November 26.

The motion also stated that the appellant had no knowledge or information concerning said witnesses and the facts to which they would testify until October 21, 1935, three days after the trial; and that he had used due diligence prior to the trial to obtain competent testimony, and did not know the State's evidence would be that robbers talked to the appellant in said barbershop. The motion was verified by the affidavit of the appellant, and attached thereto were the affidavits of Mrs. Beatty and Norman Brock substantially corroborat-

324

ing the allegations of the motion for new trial as to what testimony they would give.

It is our conclusion that the trial court did not err in overruling the motion for new trial on the ground of newly discovered evidence. It is well established that a motion for new trial on the ground of newly discovered evidence must show that the movant used reasonable diligence to obtain the evidence before the trial. A mere statement in the motion that he exercised such diligence is simply a conclusion and proves nothing. [State v. Sherry (Mo. Div. 2), 64 S. W. (2d) 238, 240; State v. McGee, 336 Mo. 1082, 1102, 83 S. W. (2d) 98, 110.]

The statement in the motion that the appellant had no knowledge or information concerning the proposed witness Brock and the facts to which he would testify, until after the trial, is contradicted by the record itself, for at the trial Capt. Mower, the owner of the barbershop, testified in appellant's behalf and said that Brock was running the shop until November 26. This was certainly sufficient to put the appellant on notice during the progress of the trial that Brock would be useful to him as a witness; and there is nothing in the motion to show that he tried and could not obtain the testimony of Brock until after the trial. So, too, with Mrs. Carpenter. She operated a restaurant adjoining the barbershop which was in the town of Neosho where the trial was going on. As soon as appellant became aware that there was an issue of fact about whether he was working in the barbershop on November 21 and 22, it seems due diligence would have required him to seek the testimony of those connected with the shop and adjoining business houses. He evidently did so with respect to Capt. Mower. We think the trial court wisely exercised the discretion which it had, in overruling the motion for new trial on this ground. [State v. Jennings, 326 Mo. 1085, 1094, 34 S. W. (2d) 50, 54.]

II. The next assignment in the brief is that the court erred in permitting the witness Griffith to volunteer his opinion that the appellant had procured men to commit the robbery and that the men so procured were present at the trial. This assignment obviously refers to the following part of Griffith's testimony. Counsel asked him: "Did he (meaning the appellant) finally get someone to do it?" and the witness answered, "He did." The court sustained an objection to this question as calling for a conclusion. Then the witness spoke up and said, "The three men are all here. He got three." Appellant's counsel objected to that answer as a voluntary statement, and the court overruled it. Then the witness went on to say he had a conversation with the appellant about the three men; and that the appellant told him they would come to see him, and that they were

real men who would do the job. He declared the three men did come, and that he went out with them and showed them where Keeling lived. Thus it is apparent the witness was referring to Hosp, McDaniels and Brookshire.

We are unable to see any substantial error against the appellant in this. It is true the witness did volunteer the statement that the appellant got three men to commit the robbery, and that they were all in the courtroom. But that testimony was competent and was followed up by the witness's statement of the facts showing the appellant did get the three men—or, at least said he did—and what was done.

III. Further error is assigned in the admission of the testimony of Hosp that after the robbery the robbers drove directly to a dairy farm in Joplin and divided the booty, $70 being set aside as the share of the appellant and Griffith. Appellant contends this evidence could only have been admissible on the theory of a conspiracy, and even if it be granted he had been a member of such conspiracy, it had ended. This contention is unsound because the object of the conspiracy had not been accomplished, if the State's evidence is to be believed. The conspiracy was to rob Keeling and obtain money which was to be divided between the robbers and their accomplices, Brookshire, Griffith and the appellant. According to the testimony of Griffith the appellant claimed a share and made efforts to get it up to the time of the arrest of the robbers. Necessarily it was intended that his share should remain in the custody of one or more of the robbers until it could be delivered to him. There is no intimation in the evidence that the robbers were to meet the appellant at some rendezvous immediately after the robbery and give him his share— or, in other words, that he was to be present when the division took place. We need not go so far as to hold that the division of the money was a part of the actual *robbery* or of the asportation and reduction of the booty to the unmolested dominion of the robbers (see State v. Messino, 325 Mo. 743, 764, 30 S. W. (2d) 750, 759); but it was within the scope and purpose of the conspiracy.

In Miller v. State, 88 Tex. Cr. Rep. 157, 225 S. W. 262, the defendant and an accomplice were charged with the larceny of a number of joints of oil casing. There was evidence that the accomplice outside the presence of the defendant sold the casing and received a check therefor payable to the defendant, and that the check was collected and the proceeds divided with the defendant. Objection was made to proof of these transactions had in the absence of the defendant, but the Texas Court of Criminal Appeals ruled the evidence competent saying the defendant and the accomplice were coconspirators, according to the evidence from the State's view-

point, and that the object of the conspiracy "was the acquisition of the property, its sale, and the apportionment of the proceeds.''

In Hooper v. State, 187 Ark. 88, 58 S. W. (2d) 434, the defendant was convicted as an accessory after the fact to the robbery of a bank. There was testimony for the prosecution that after the robbery and after the actual robbers had left the State, another accomplice who was a son of the defendant, brought some money to the home of still another accomplice as his share of the proceeds, stating it had been sent by his father (the defendant). The admission of this testimony was objected to on the ground that it was incompetent since the purpose of the conspiracy had been consummated. The court said: "Although it is true that the acts and declarations of a conspirator are inadmissible against his coconspirator after the accomplishment of the purpose of the conspiracy, such is not the case here. The purpose was to rob the bank and procure the money, and necessarily distribute it among those participating in the enterprise, and the conspiracy cannot be said to have ended so long as the money procured in the robbery had not been divided among the robbers.''

In People v. Becker, 215 N. Y. 126, 150, 109 N. E. 127, 134, Ann. Cas. 1917A, 600, 608, it was held: "Where a conspiracy to kill involves the employment of hireling murderers, the proof is not necessarily so limited as to exclude all evidence of occurrences after the killing. The fulfillment of the agreement by the subsequent payment and receipt of the sum agreed upon is a relevant fact and, therefore, properly provable—just as it would be relevant by way of defense to show that no money had ever been paid to the actual slayers at the instance of the person accused of having procured their employment.''

Likewise in Rawlins v. State, 124 Ga. 31, 46, 52 S. W. 1, the prosecution of M and J was for murder. There was evidence for the State that J procured M and others to kill C, and agreed to pay $100 therefor. It was further proved that on the morning after the killing J went to the bank in the absence of M and borrowed $110, and that the $100 blood money was paid by him to another of the alleged murderers that same morning after the crime was committed. The evidence was held competent against M.

IV. The final assignment in appellant's brief complains of the trial court's restriction of his cross-examination of the accomplice Griffith, and we think it is well taken. The first contention is that the court erred in denying appellant's counsel the right to ask the witness whether he had been promised immunity for testifying. The question was: "You saved your hide by testifying, didn't you, Hot?" An objection was sustained and the following offer of proof

was made. "We offer to prove by this witness that this case has been dismissed against him so that he will testify against Al Rose." The court refused the offer but said, "You can show that the case has been dismissed, if you want to." The offer of proof is not as explicit as it might be, but it was evidently intended to be directed to the proposition that the witness had been promised immunity for testifying, and the learned Assistant Attorney General so concedes in his brief.

The rule in this State is that the nature and extent of cross-examination is largely discretionary with the trial judge. State v. Ryland, 324 Mo. 714, 719, 25 S. W. (2d) 109, 111; or as has been more mildly said the trial court has "some discretion" in the matter, State v. Loahmann (Mo. Div. 2), 58 S. W. (2d) 309, 311; or a discretion "to a certain degree." [Mann v. St. L.-S. F. Ry. Co. (Mo. Div. 2), 72 S. W. (2d) 977, 981.] But it is also said great latitude is allowed on cross-examination. [State v. Albritton, 328 Mo. 349, 364, 40 S. W. (2d) 676, 680; State v. White, 251 Mo. 178, 158 S. W. 32, 34.] In Gurley v. St. L. Transit Co. (Mo. App.), 259 S. W. 895, 898, the St. Louis Court of Appeals said: "The right of cross-examination is a right the law freely accords to any litigant who finds himself confronted by an adverse witness, and it may not be unduly restrained or interfered with by the court. The right of a litigant to cross-examine an adverse witness within proper bounds is an absolute right, and it is not within the discretion of the court to say whether or not the right will be accorded."

Especially is this true in the cross-examination of accomplices. In State v. Steele, 226 Mo. 583, 602, 126 S. W. 406, 412, this court said: "As before stated in the cross-examination of witnesses, those who have any interest in the prosecution or those who by testifying are to receive some immunity from criminal charges, great latitude should be allowed. Legitimate and proper cross-examination is one of the well-recognized methods of ascertaining the truth. While to both the examination in chief and the cross-examination there should be a limit, we take it that where questions are propounded which tend to throw light upon the subject under investigation, the court should not exclude such questions or answers to them."

State v. Ritter, 288 Mo. 381, 388, 231 S. W. 606, 608, recognized the rule allowing a party the right of cross-examination to ascertain if a witness's testimony is animated by any other purpose than a statement of the facts; but decided that where a witness had been asked on cross-examination whether her extrajudicial *statement* to the prosecuting attorney (rather than her *testimony* at the trial) was not inspired by a hope that she would not be prosecuted, the trial court's action in shutting off that line of examination was not reversible error. The opinion held, however, that if the question had been directed to ascertaining her hopes and expectations dependent

upon her testimony, the exclusion of an answer showing a connection between them would have been error.

In State v. Ritz, 65 Mont. 180, 211 Pac. 298, 300, the Supreme Court of Montana says, citing many supporting decisions: "Very great latitude indeed ought to be allowed in the cross-examination of an accomplice, and to that end the cross-examination should be permitted to test his credibility by subjecting him to a most searching inquiry as to any promise of immunity or leniency made him, or any hope or expectation he may entertain of escaping punishment. A less liberal rule would be calculated to place the defendant, to some extent, at least, at the mercy of a witness who may have compelling reasons for desiring his conviction."

In State v. Pellet, 53 N. D. 183, 204 N. W. 983, a ruling to the same effect is accurately reflected in the syllabus to the report of the case in the Northwestern Reporter, which says: "Great latitude should be allowed in the examination of an accomplice. The defendant has a right to examine a witness for the State, admittedly an accomplice, for the purpose of showing the probability of interest or bias, and in the course of such examination may ask whether the witness has been arrested or prosecuted for the crime under investigation, in the commission of which he was implicated with the defendant; and when the rulings upon objections to such questions and the attitude of the trial court are such as, in effect, exclude inquiry whether the accomplice has received any promise of leniency or immunity from the State, the limitation upon the cross-examination constitutes prejudicial error." [To the same effect see 1 R. C. L., sec. 12, p. 166; Gibbs v. State, 37 Ariz. 273, 293 Pac. 976, 978, 74 A. L. R. 1105; Commonwealth v. Viscosky, 83 Pa. Super. Ct. 96, 100.]

In the instant case the testimony of Hosp and Brookshire connecting the appellant with the robbery was circumstantial and weak. Boiled down all they said was that McDaniel, one of the robbers, had a conversation with the appellant in the barbershop near the jail on the day preceding the robbery and the day of the robbery; and that on the latter date the three of them immediately picked up Griffith and drove out to look over Keeling's dairy farm where the robbery was committed that night. Griffith was the only witness who directly connected the appellant as an accessory to the robbery. He, himself, admittedly was such and expected to profit therefrom. His reputation for truth and veracity was impeached and undefended. When he was first called to the witness stand an objection was made to his competency as a witness and the prosecuting attorney told him to go outside. After an interval he was recalled to the stand and gave the testimony heretofore set out, which degraded him as much as it did the appellant. In our opinion it was unfair to the appellant to shut off the cross-examination of his counsel which

sought to elicit whether he had been promised immunity or a lighter sentence for his connection with the crime.

That this was an important inquiry is shown by the course the State took with reference to the witness Brookshire. After Brookshire had testified and left the stand and another witness (Griffith) had come on and answered a few questions, Brookshire was recalled and the prosecuting attorney proved by him that he was then confined in jail charged with complicity in the robbery, and had pleaded guilty to the charge. In other words, in behalf of the State the prosecuting attorney took the precaution to prove that Brookshire had not been granted immunity and was in jail (though there was no showing as to whether the punishment had yet been assessed on his plea of guilty). But when the appellant sought to cross-examine Griffith along that same line he was not permitted to do it. We think this was reversible error.

Another error charged in the appellant's cross-examination of the witness Griffith concerns questions asked him touching on his feelings toward the appellant. Appellant's counsel asked the witness: "Hot, when did you get mad at Al Rose? A. Well Rose and I have been friends in a way for a good while. Q. Didn't you get mad at him when you went to him to go on your bond when you were charged with running a bawdy house, and he refused? (Objection but no ruling by the court.)" Mr. Ruark, counsel for appellant: "I offer to show by this witness that he has a feeling against the defendant because he refused to sign his bond." The court: "It will be refused. You cannot show the purpose of it, or the reason for it." Thus it will be seen the witness had answered that he and the appellant had been friends in a way for a good while. Then appellant's counsel asked him if he did not get mad at appellant when the latter refused to sign his bond on a criminal charge. The appellant offered to prove this to be the fact and the court excluded the offer holding the reason for the witness's feeling could not be proven.

If this were the only error assigned perhaps it would not be sufficient to call for a reversal and remanding of the case, but we think it was error. It is true that when there has been proof of ill feeling or unfriendliness between a party and some witness testifying against him this does not throw the door wide open and entitle the party to prove in detail the reasons therefor, or to go into the merits of their differences, Sevier v. Harmon (Mo. App.), 261 S. W. 348, 349; Wells v. Sullivan, 211 Mo. App. 318, 325, 242 S. W. 180, 182; State v. Gabriel, 301 Mo. 365, 375, 256 S. W. 765, 767; but it is proper in such instances to inquire into the character, nature and extent of the hostility or bias of the witness; 70 Corpus Juris, section 1167, page 964; and the party is not confined to the colorless fact that such ill

330

feeling exists. He can prove the ultimate facts out of which the hostility arose.

For the reasons stated in this paragraph of the opinion the judgment is reversed and the cause remanded. All concur.