STATE of Missouri, Respondent,

v.

Oscar WINN, Jr., Appellant.

No. 47081.

Supreme Court of Missouri,

Division No. 2.

June 8, 1959.

638

Morris A. Shenker, Bernard J. Mellman, St. Louis, for appellant.

John M. Dalton, Atty. Gen., John W. Inglish, Asst. Atty. Gen., for respondent.

EAGER, Judge.

Defendant was convicted of assault with intent to kill, without malice, and sentenced to two years in the penitentiary. The victim was Essie Mae Winn, defendant's wife. The shooting was the culmination of a long series of arguments, separations, and domestic discord. We shall state the facts briefly, as there is no question of the sufficiency of the evidence.

Defendant first met Essie about 1945, while she was a cook at a sorority house in Columbia, Missouri, and he was a houseboy. She was much older than the defendant, at least fourteen years, and probably more. She was married at the time, but apparently was not living with her husband. They began living together, and the relationship continued, off and on, until the time of this shooting. Defendant left Columbia for his mother's home in Brunswick, and Essie came there; he moved to Moberly and she came there; they bought a house in Moberly and lived there several years. Defendant left again and went to St. Louis, but Essie came there a few months later,

located him, and they resumed their relationship. They bought a house there. About 1949 she told defendant that she had gotten a divorce and she testified that she had done so. By Essie's admissions and defendant's testimony, he continued to leave her frequently, and stayed from time to time in rooms at different locations; she spent one year in Michigan; but for some reason or reasons, they always got back together. Defendant insisted that Essie followed him, dominated him, enticed him back, and at times threatened him; incidentally, she was a large woman, weighing at least 180–185 pounds. They were married in July, 1957, about three months prior to this shooting. Their domestic life was enlivened with frequent arguments and with an occasional shooting. Defendant testified that Essie had shot at him three times. She admitted one of these occasions, admitted that she had owned a .38 caliber revolver, and admitted that defendant once broke up her gun with a hammer; she also testified that defendant had shot at her in July, 1957. The domestic relationship was further embroiled by the suspicion, confirmed or unconfirmed, on the part of each spouse, that the other was associating with one or more other persons of the opposite sex. There was evidence that Essie, at least upon occasions, carried a revolver in her purse. With this somewhat tarnished background, our principals separated again about Oct. 5, 1957; vaguely, this seems to have had something to do with a Buick car which they had bought and which was repossessed on Oct. 8, 1957. Defendant returned to the house on the evening of Oct. 11, as he says, to get his things, and he stayed there that night alone. Essie had been staying next door, and defendant testified that he saw her and two of her friends leave that night with three men, returning early the next morning. In any event, Essie appeared in front of their house (or the house next door) about 7:15 or 7:30 on the morning of Oct. 12. She says that she had been to the grocery and that defendant called her into the house; he says she came

in of her own volition. There is little or no agreement on what happened thereafter except that she was shot, admittedly with an "over and under" gun owned by defendant. This was a combination .22 rifle (upper barrel) and .410 shotgun (lower barrel). It had no safety, but that effect was partially achieved when the hammer was on "half-cock." The barrel to be fired was selected by the movement of a device on the side; the gun held only one shell of each type. Essie testified: that when she got into the house, following the defendant in, he said, "Essie Mae, you have gone too far this time. I will kill you"; that she was standing "better than the full length of the bed" from him, and that he picked up the gun, "didn't aim it," but shot her in the arm; that he then shot her again over the heart; that she then "backed up," and he kicked her in the stomach twice; that she sat down in a chair and that he "clubbed" her with the stock of the gun. At that time one of the neighbors entered, the police were called, and the hostilities ended. Defendant's version was: that Essie called him at the home on the night preceding the shooting and said that "If I didn't get out of her house they would carry me feet first"; that he was packing his things about 7:30 when Essie came in; that they got into an argument about the car and "who was the fellow she was out with," and that "she got mad"; that she came towards him and "went to her breast," and he thought she had a gun; that he tried to shove her back, picked up the gun from the bed, cocking it, to protect himself. From this point in his testimony there is considerable confusion as to whether he purposely fired at her in self-defense as she advanced, or whether the gun was fired accidentally in the struggling which he says occurred. He did state that he had his hand on the trigger. Defendant testified that the gun was fired only once; that she was still fighting and that he pushed her into a chair. Both seem to agree that only the .22 barrel of the gun was fired.

Essie had three wounds, one on the anterior surface of the left forearm, one on the right forearm and one in the left breast, not far from the heart. A hospital physician who had examined her as a preliminary to her entrance into the hospital so testified. It was not satisfactorily explained how she received three wounds, but it seems apparent that one arm must have been in the line of the shot which struck her breast. Defendant attempted to explain how one bullet made three wounds, but not too impressively. Essie remained in the hospital about six days. We will refer later to the hospital record. There was testimony, pro and con, regarding prior threats of Essie toward defendant and of defendant toward her; he testified that she had twice threatened to shoot him. Defendant also testified, with some corroboration, that Essie had stated shortly before the trial, that she wanted him to come back home, but if he did not, she would send him "to the pen." Certain other features of the record will be referred to later.

█ The trial court gave Instruction No. 6 on self-defense in a form which is not questioned. In doing so, it gave defendant the benefit of the doubt, in view of the confused state of defendant's own evidence. See State v. Dill, Mo., 282 S.W.2d 456. Instructions No. 2 and No. 3 were the State's principal verdict-directing instructions. In No. 2, the jury was told, in substance, that if defendant "feloniously, wilfully, on purpose, and of his malice aforethought" assaulted Essie Winn with the intent to kill, then it would find him guilty of assault with intent to kill with malice aforethought; also, that malice "means the condition of mind which prompts one person to take the life of another or attempt to do so without just cause or justification, * * *." In Instruction No. 3 the jury was told that if the defendant "wilfully and on purpose" assaulted Essie "with intent to kill, but * * * without malice aforethought," as already defined, then it would find the defendant guilty of assault with intent to kill

without malice aforethought. This instruction contained no qualifying words or phrases, and no reference to any other instruction. We note also that the word "feloniously," used in Instruction No. 2, was omitted in Instruction No. 3. Defendant attacks each of these instructions on the ground that it eliminates his legal defense, and permits the jury to find him guilty even though it may have believed the shooting justifiable in self-defense. Defendant cites: State v. Helton, 234 Mo. 559, 137 S. W. 987; State v. Gabriel, 301 Mo. 365, 256 S.W. 765; State v. Jones, 309 Mo. 50, 273 S.W. 730; State v. Dougherty, 358 Mo. 734, 216 S.W.2d 467, and State v. Venable, 117 Mo.App. 501, 93 S.W. 356.

■ Considered together, the first three of these cases hold that an instruction on assault with intent to kill which purports to cover the whole case, but excludes the idea of self-defense, constitutes prejudicial error. In Helton [234 Mo. 559, 137 S.W. 988] the instruction hypothesized an assault "with intent to kill him or do him some great bodily harm," and was held to be error, although a separate instruction was given on self-defense. The court said there (137 S.W. loc. cit. 989): " * * * The fault of the instruction is, that it only required the finding of an 'intent to kill or do great bodily harm,' whether justifiable and innocent or wrongful and willful, to make it the duty of the jury to bring in a verdict of guilt. * * *" In Gabriel, supra [301 Mo. 365, 256 S.W. 767], the instruction hypothesized an assault "willfully, that is to say, intentionally and not by accident * * * with intent to kill * * *." This instruction was held to be error, as ignoring the defense of self-defense. The court said (256 S.W. loc. cit. 767): " * * * Defendant might have shot Pierce intentionally and thereby endangered his life, and yet may have been entirely justified in so doing in the necessary defense of his person. The instruction was therefore erroneous and constitutes reversible error. State v. Helton, 234 Mo. 559, 137 S.W. 987; State v. Stubblefield, 239 Mo. 526, 144 S.W. 404.

The instruction required the finding of no fact which negatived the defense of self-defense as in State v. Wicker, Mo., 222 S. W. [1014], loc. cit. 1016. Separate instructions on self-defense given by the court did not cure this error." In Jones, supra, the instruction hypothesized a felonious assault "on purpose," and with intent to kill; it was likewise held erroneous. As indicated in State v. Wicker, Mo., 222 S.W. 1014, 1016, the inclusion of the words "without just cause or provocation" may constitute a sufficient preservation of the theory of self-defense; the same might be said of such a phrase as "and not justifiable in self-defense, as defined in another instruction" or some other similar exception. For the reasons stated in these cases we hold that Instruction No. 3 was prejudicially erroneous. It is true, as suggested by the State, that this rule was criticized in State v. Douglas, 312 Mo. 373, 278 S.W. 1016, 1023, where the principal instruction on forgery allegedly failed to embody the defense of insanity; that defense was covered in a separate instruction. The court held that the requirement of an "intent to defraud" in the principal instruction incorporated the necessity of sanity and thus excluded insanity, saying (278 S.W. loc. cit. 1026): " * * * If defendant knew he was defrauding his employer by his forgery his conscious guilt would make his act without 'just cause or excuse.' * * *" The court distinguished the Helton and Gabriel cases cited supra, on the grounds already discussed. Yet, somewhat gratuitously, it added the suggestion that it did not feel that the distinction made in the self-defense cases was based on sound reason, there being separate and correct instructions on self-defense. To the same general effect see, also, State v. Glass, 318 Mo. 611, 300 S.W. 691, an opinion by the same judge. There the instruction contained qualifying words which were held to preclude the idea of self-defense, but similar references were made to the curative effect of a separate instruction. We find, however, that in State v. Dougherty,

358 Mo. 734, 216 S.W.2d 467, the court reaffirmed in principle the doctrine of the Helton and Gabriel cases, saying, loc. cit. 473: "An instruction which purports to cover the whole case and entirely ignores a defense supported by evidence is erroneous and constitutes reversible error. State v. Gabriel, 301 Mo. 365, 256 S.W. 765, 767; State v. Busch, 342 Mo. 959, 119 S.W.2d 265, 269. * * *" The situation there was different, but we cannot ignore the ruling. We are urged, very frankly, to abandon the rule and adopt the dictum in the Douglas case, supra. Our theory of instructions and our rulings on instructions may appear, at times, to be somewhat cumbersome and technical; but so long as we adhere to the practice of giving written instructions, which the jury may take and study, it is essential that each and every instruction be at least substantially correct, certainly to the extent that it is not affirmatively misleading, and that no two or more instructions shall be conflicting in a material sense. The sudden abandonment of this rule which has long been recognized, would probably result in many and presently unforeseen complications. We hold Instruction No. 3 to be prejudicially erroneous.

This makes our ruling on Instruction No. 2 more or less academic; but, as held in State v. Glass, 318 Mo. 611, 300 S. W. 691, and as indicated in State v. Wicker, Mo., 222 S.W. 1014, 1016, the words "on 'purpose and of malice aforethought'" required the jury to find facts which would definitely negative self-defense, particularly in view of the definition of "malice," as given. We hold that Instruction No. 2 was not erroneous; in fact, defendant was not convicted under that instruction, and unless it could be deemed to prejudice him generally, he would have no complaint of it.

It will be necessary to refer very briefly to certain other points urged. We shall not rule on the admissibility of the hospital records produced and referred to by Dr. White, who was apparently an intern or resident physician assigned to the Receiving Department of the Homer G. Phillips Hospital at the times involved. The parties may consider the essential elements of the qualification and proof of such records as outlined in Conser v. Atchison, T. & S. R. Ry. Co., Mo., 266 S.W.2d 587, certiorari denied 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653; Lockhart v. St. Louis Public Service Co., Mo., 318 S.W.2d 177; Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, loc. cit. 665, 666, 55 A.L.R.2d 1022, and Fisher v. Gunn, Mo., 270 S.W.2d 869. Trial courts are given considerable discretion under the statutes (sections 490.680 and 490.690 RSMo 1949, V.A.M.S.), but the essential requirements must be shown. We do not know what the evidence will be upon another trial, hence we decline to rule now on the admissibility of the record generally.

Under the present circumstances we need not rule upon the admissibility of the evidence of a prior arrest of defendant, following an argument with his wife, and the taking of a pistol from him. We note that the objection made was insufficient, counsel merely saying: "I object to that." See: State v. Keller, Mo., 281 S.W. 960; State v. Luckett, Mo., 246 S.W. 881. The motion for a mistrial was not based upon a sufficient objection. The same evidence may not appear at another trial, and it is unnecessary to determine whether this evidence was "invited" (as the court indicated), though in contravention of the general rule against the admission of prior arrests or charges not resulting in conviction. See, generally, State v. Snow, Mo., 252 S.W. 629, 631; State v. Menz, 341 Mo. 74, 106 S.W.2d 440; State v. Pine, 332 Mo. 314, 57 S.W.2d 1087; State v. Ross, 306 Mo. 499, 267 S.W. 853.

The last point briefed by defendant's counsel is that the court unduly restricted the cross-examination of the prosecuting witness, Essie Mae Winn. Necessarily, the trial court is permitted much discretion in determining, and limiting, the

scope of cross-examination. State v. Murrell, Mo., 169 S.W.2d 409. Particularly is this true as to collateral matters. State v. Burchett, Mo., 302 S.W.2d 9, 18. The defendant is entitled to "a reasonable cross-examination" for the purpose of impeachment (State v. Thompson, Mo., 280 S.W. 2d 838, 841) or otherwise, and he should be allowed a reasonable latitude in cross-examination in order to "place the witness in his proper setting" (Thompson, supra), but there is a limit. State v. Rose, 339 Mo. 317, 96 S.W.2d 498, 504. Generally, a defendant is entitled to show material ultimate facts, but not all details (State v. Rose, supra), nor does the latitude extend to matters of "trivial or minor importance." State v. Burns, Mo., 280 S.W.2d 119, 121. The defendant is generally permitted to show the hostility of a witness by proving the ultimate facts out of which the hostility arose. State v. Rose, supra. There often remains a shadowy line of distinction between the permissible and the nonpermissible cross-examination, the exact location of which must generally be left to the trial court. We apply these principles to those present complaints which are likely to arise on another trial. There was no error on this record in restricting the cross-examination of Essie as to her age. She stated her age (with some variation) at least twice and the matter became repetitious. The defendant was entitled, by a reasonable cross-examination, to show a disparity in age, for what it might be worth. The inquiry concerning her association with other men in Moberly was so remote as to come within the discretionary right of exclusion by the trial court. We think that the ultimate facts concerning the purchase of the home in St. Louis by whom and in whose name, and the circumstances of any transfer by defendant to Essie, were of sufficient materiality to be admissible; such facts concerned their general relationship and history, and might well have had some bearing upon Essie's attitude toward defendant, and upon her credibility in the light of the defendant's testimony. Defendant should be permitted generally to trace the domestic relationship over the years, and he was substantially permitted to do so. The issue here, actually, is not whether Essie "dominated" the defendant, but whether she gave him reasonable ground to apprehend danger of death or injury from her. The supposed taking by Essie of clothing and property from defendant's separate abode is of no great materiality, but the objection here was insufficient, and the evidence was improperly excluded. This had some possible bearing on her attitude and hostility toward defendant and the answer should have been permitted.

We find no error in the matters which are to be examined here regardless of their preservation for appellate review.

For the error noted in giving Instruction No. 3, the judgment is reversed and the cause is remanded.

All concur.