THE STATE v. J. H. EVERHART, Appellant.

Division Two, December 20, 1926.

1. **SUBSTANTIAL EVIDENCE: Poisoning.** Although there is no direct proof that defendant had ever had strychnine in his possession or that he was ever seen to put anything in the jar of whiskey from which deceased drank and soon afterwards died with all the symptoms of strychnine poisoning, if sufficient motive is shown, and the facts testified to by witnesses constitute a damaging array of circumstances pointing to defendant's guilt and exclude the guilt of all others, a verdict of guilty of murder cannot be set aside on the ground that the evidence is insufficient to sustain it.

2. **CONVERSATIONS: Explanation: Limited to Categorical Denial.** Where the State has proved damaging statements made by defendant, his explanation should not be limited to a categorical denial, but he is entitled to show what the statements really were. Where the State has shown by witnesses damaging statements made to them by defendant he is entitled to deny them altogether, or to show what they actually were. And especially so, where he admits having conversations with the witnesses, but claims the statements attributed to him by them were not correctly detailed, and if he could give his version of them or give the entire conversations they would appear to have an entirely different meaning.

3. **HYPOTHETICAL QUESTIONS: Omission of Facts.** An objection to a hypothetical question that it omits material facts should point out the particular omissions.

4. ———: **Assumption of Fact.** Although there is no direct testimony that defendant put strychnine in the jar of whiskey from which deceased drank, or that the whiskey contained strychnine or other poison, yet if the circumstances tend to show such facts, a hypothetical question which assumes that defendant administered poison and that the liquor contained poison is not erroneous.

5. **INSTRUCTION: Motive: Evidence of Guilt.** An instruction asked by defendant telling the jury that proof of his illicit relations with deceased's wife should not be taken as evidence of his guilt of murder should be refused. Such testimony tends to show motive, and is properly considered for that purpose, and when so considered is evidence tending to show guilt.

Corpus Juris-Cyc. References: **Criminal Law,** 16 C. J., Section 1111, p. 571, n. 11, 16; Section 1553, p. 755, n. 4; p. 756, n. 8; Section 2198, p. 875, n. 19; Section 2199, p. 877, n. 28; 17 C. J., Section 3543, p. 203, n. 85, 87; Section 3679, p. 334, n. 4, 6. **Evidence,** 22 C. J., Section 497, p. 413, n. 32, 33, 34. **Homicide,** 30 C. J., Section 559, p. 312, n. 42; Section 602, p. 350, n. 15.

Appeal from New Madrid Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED.

*Gallivan & Finch* and *Ward & Reeves* for appellant.

(1) The court erred in the rejection of testimony. (a) Ed McDole stated that the defendant told him deceased's wife had asked

him to state to the witness not to give the deceased a steady job; that she wanted him to get out of the country. This was denied by the defendant, and defendant says he did have a talk with him, and then the court refused to permit defendant to state what he did say to him in this connection, and which was the defendant and McDole were talking about McDole hiring Dunning and he remarked to McDole that Mrs. Dunning did not want her husband to work in town, but she wanted him to get out on a farm in the country, from the bootleggers, as they were keeping him drunk all the time. Kieth, for the State, testified that Dunning owed him a board bill and he turned it in to Dunning's employer, and it made Dunning mad, and that the defendant told him that this board bill was going to cause the witness or Dunning, one, to wear a wooden overcoat, and "if he was me he wouldn't take any chances; he would get a gun and shoot him, open his knife and throw it down by him, and claim self-defense." Defendant admits that he had a talk with Kieth, but didn't say what Kieth said he did; the court refused to let him state what the conversation was, to-wit, that Kieth said to the defendant, "I understand Dunning claims he is going, the first time he sees me, to take $10 out of my pocket to pay this board bill, and if he undertakes to do that either Dunning or I will wear a wooden overcoat." The defendant admitted having a conversation with the witness, but denies that the statement was a threat or was in the language testified to by the witness, and that the statement as made was in the defendant's favor, and not against him. He is permitted by law to give his version of what was said, and it is reversible error to refuse it. 22 C. J. 417; Fidelity & Cas. Co. v. Dorough, 107 Fed. 389; Carver v. United States, 164 U. S. 696; Hathaway v. McBride, 198 S. W. (Mo. App.) 1143. (2) The court erred in refusing the cautionary instruction offered by defendant as to the testimony of alleged intimate relations of defendant with the wife of the deceased. The court, over defendant's objection, had permitted the testimony of alleged intimacy of the defendant and the wife of the deceased. Thereupon, at the close of all the evidence, the defendant offered a cautionary instruction to the jury, advising the jury that the defendant was charged with murder in the first degree, and not for intimate relations with the deceased's wife, and to the effect that they could not convict the defendant of murder merely because they should find such intimacy existed. Such cautionary instruction was proper in this case and reversible error to refuse it. State v. Stewart, 278 Mo. 177; State v. Privitt, 175 Mo. 218; State v. Stewart, 274 Mo. 660. If said instruction is not in proper form, then it was sufficient to suggest to the court to give a cautionary proper instruction, and the refusal to do so is error.

State v. Lawkovitz, 265 Mo. 613; State v. Farr, 255 S. W. 1069; State v. Good, 220 S. W. 854.

*North T. Gentry,* Attorney-General, and *J. D. Purteet,* Special Assistant Attorney-General, for respondent.

(1) The trial court did not err in rejecting testimony of appellant which sought to detail certain conversations had by him with witnesses McDole and Kieth prior to deceased's death. Self-serving statements of defendants are not admissible in evidence. Appellant was permitted and did deny that he had made the statements as related by the witnesses; therefore, the error, if any, was harmless. Self-serving statements by defendant which are not a part of the *res gestae* and have no relation to the charge are inadmissible. State v. Long, 201 Mo. 664. (2) The trial court committed no error in refusing to give appellant's alleged cautionary instruction. Instructions which single out certain parts of the evidence and have the effect of commenting thereon are improper and should not be given to the jury in a criminal trial. The subject-matter of the requested instruction was well covered in the court's main instruction. It is not reversible error to refuse requested instructions which have been covered by given instructions. State v. Millsap, 276 S. W. 630; State v. Nevitt, 270 S. W. 339; State v. Cooper, 271 S. W. 476.

BLAIR, J.—Appellant was convicted of murder in the first degree for causing the death of Clarence Dunning by strychnine poisoning. The jury assessed his punishment at life imprisonment. After unavailing motion for new trial, appellant was sentenced upon the verdict, and has appealed.

Dunning and his wife and two small children lived with and kept house for appellant and his infant daughter in a house owned by appellant in Parma, New Madrid County. Dunning and wife were each about twenty-four years old. Appellant was forty-seven years old.

The proof of appellant's guilt was entirely circumstantial. The evidence offered by the State tended to prove that Dunning died on September 21, 1925, from strychnine poisoning. The attendant symptons indicated such poisoning. His stomach was removed and sent to a specialist and its contents were analyzed and the presence of a fatal amount of strychnine was discovered.

Appellant and the Dunnings had been living in the same house of two rooms since the previous May. The theory of the State was that appellant wanted to get Dunning out of the way so that he could have his wife. Mrs. Dunning testified that appellant had forced her to have sexual relations with him several times. A neighborhood

woman at one time came upon them unexpectedly when they were apparently about to or had just been engaged in that act. Appellant denied all other damaging evidence in the case except that tending to show his illicit relationship with the wife of deceased.

Mrs. Dunning and appellant were both arrested for the crime. She admitted that she was released from custody after she had told the prosecuting attorney of her previous illicit relations with appellant and that appellant had poured out the supposedly poisoned whiskey, which will be noticed later. There was no testimony in the case which indicated that Mrs. Dunning had any part in the death of her husband, except that she had an opportunity to have administered poison to him and the fact that she had sustained illicit relations with appellant, which she described as forced upon her and intolerable.

There was no testimony that appellant had purchased or ever had in his possession any strychnine. There was testimony tending to show that he had an opportunity to put poison in some whiskey deceased was drinking. There was testimony tending to show that appellant had said things indicating that he considered the poisoning of deceased. He had suggested to Mrs. Dunning that she fix up his lunch and leave it out some place and he would put something in it that would fix her husband and Mrs. Dunning need know nothing about it. He had suggested to her that she get rid of her husband and he would give her a fine home, nice clothes and take good care of her.

One Harchous testified that he had a conversation with appellant on the very morning of deceased's death, in which appellant told him that he had had a little argument with Dunning the day before and that he was going to get a shot gun and shoot him and then take a long-bladed knife, place it beside his body and claim it was self-defense; or he was going to poison him. Other testimony tended to show that the appellant had the idea in his mind of getting rid of Dunning by the poison route.

Two days before Dunning's death he and his family had driven to Delta with appellant in appellant's car and returned the next day. Dunning got some "white mule" whiskey at some place and time during the trip. He offered to give appellant some, but he refused on account of being the driver. It does not appear that Dunning took mor than one drink at that time.

The next morning the family arose between five and six o'clock. Appellant admitted that he and Dunning went out to the garage before breakfast and each took a drink of "white mule" out of Dunning's bottle. Mrs. Dunning testified that appellant took a fruit jar which "was setting" near the pump and that he and deceased went into the garage and remained a few minutes and that deceased was all right at the time. Appellant left to go up town, expecting to

go to Bloomfield to attend court, whereat he had been summoned as a witness. He told deceased to take good care of things.

Deceased helped his wife at dusting and cleaning and other work about the house. He also played the Victrola for awhile. He then went to the garage where he obtained another drink of the "white mule." Almost as soon as he came back into the house he began to give evidence of physical distress. He clutched at the door frames with convulsive fingers. His face became set in an alarming and meaningless grin and soon became discolored. His muscles became rigid. Mrs. Dunning could not release his hold from the door frame. She called a doctor and together they got Dunning into bed and treated him and gave him medicine.

Before appellant had time to get away to Bloomfield, he heard that Dunning had been taken very sick and came home. Dunning was still able to talk at that time. He asked appellant if the fruit jar, in which he had put the whiskey, was clean and appellant assured him that it was. Dunning said: "Are you certain it was? It certainly made me feel awfully funny." The doctor told Mrs. Dunning to preserve the contents of the fruit jar. Dunning told appellant to throw out the whiskey for fear the children would get hold of it. Over the protest of Mrs. Dunning, appellant threw it out.

Dunning died before noon. Mrs. Dunning testified that appellant asked her if she thought he did that and she told him that she thought he was responsible. He said he did not do it. Witness Harchous testified further that on the day following Dunning's death appellant asked him not to tell anything he had said the morning before.

Chris Myers testified that, while he and appellant were in the New Madrid jail appellant tried to get him to testify in his favor and that, through one Albert Bevel, another jail inmate, appellant had sent him a note, which we quote as it appears in the record:

"You tell that you was at my house that morning you and Joe Caral and Clarence told you he put the poison in the whiskey for another man that he was going two get rid of him and he showed you the jar that he had the poison in you tell that he told you that he got some whiskey from Harchast that morning you tell that he told you I dident know enything about it. If *tha* ask you if Clarence Drank all the time you tell them yes you tell them that he mixed and mingled with it all the time if *tha* ask you where I was tell them I was gone *two Cort* Tell this *an* stay with it Say Cryt the aturneys will be *two sea* you stay with it."

Appellant denied writing the note. The State offered Mrs. Dunning and another witness who testified to their familiarity with appellant's handwriting and gave it as their opinions that the note was in appellant's handwriting. A number of witnesses offered by appellant testified concerning his good reputation as a peaceable and law-abid-

ing citizen. On cross-examination some of them admitted having heard something said about appellant making sales of liquor in violation of law.

One of appellant's attorneys testified to a conversation with Chris Myers, in which Myers said that deceased told him he had fixed a jar of poisoned liquor for some one else to drink and had himself gotten hold of it by mistake. It was for that reason that appellant brought Myers from the reform school upon a writ of *habeas corpus* in order to use him as a witness.

Appellant testified to the existence of friendly relations between himself and Dunning. He denied having made threats against Dunning or having put strychnine in his liquor. He also denied writing the note to Chris Myers above quoted.

It is contended that the evidence is not sufficient to support the verdict. While there is no direct proof that appellant had ever had any strychnine in his possession or that anyone saw him put anything in the jar of whiskey, from which deceased drank, the circumstances point to his guilt. There is nothing to indicate that deceased took poison for the purpose of self-destruction. The proof tended to show that death was caused by strychnine poisoning. A probable motive on the part of appellant for getting rid of deceased was shown. He did not even deny his illicit relations with deceased's wife. Appellant was shown to have made statements and threats indicating that he was considering poisoning deceased. He was shown to have had an opportunity to do so when he took a fruit jar out to the garage at the time the liquor was poured into it. Deceased's question about the cleanliness of the jar indicated that appellant was the one who poured the liquor into the jar. As soon as deceased drank from the fruit jar, he became sick and distressed and exhibited symptoms of strychnine poisoning. In addition to this, appellant, though warned not to do so, threw out the liquor and destroyed the only means of showing that the liquor in question did not contain strychnine, if it did not. Then in jail appellant sought to get Myers to give false testimony tending to show that deceased fixed up poison for another and took it himself by mistake.

All these facts were testified to by witnesses for the State. If believed by the jury, they constituted a damaging array of circumstances pointing to the guilt of appellant and tending to exclude the guilt of anyone else. The jury, as it had the right to do, evidently believed the State's witnesses. The verdict founded upon such evidence cannot be set aside on the ground that the evidence is not sufficient to support it.

The trial court is charged with error in refusing to permit appellant to give his version of statements said to have been made by appellant.   Ed McDole's direct testimony included the following:

*Damaging Statements: Full Explanation.*

"Q.   Will ask you, if before the death of Clarence Dunning, the defendant Everhart ever made any statement to you about Dunning?   A.   Well, he met me one afternoon and said to me—says, Curley told his wife that he thought he could get a steady job at the gin this fall and she asked me to tell you not to give him a steady job, she wanted him to get on away out of the country.

"Q.   How long was that before Clarence Dunning died?   A.   That was sometime in August, but I don't remember the day."

Appellant denied making such a statement to McDole and offered to prove that "he had a talk with McDole in which McDole told him he was thinking of hiring Dunning and they were talking about it and he merely remarked to him that Mrs. Dunning did not want her husband to work in town; that she wanted to get him out on a farm in the country away from the bootleggers as they were keeping him drunk all the time."   This offer was excluded and exception saved.

Bud Kieth testified as follows:

"Q.   Will ask you, Bud, if before Everhart—Clarence Dunning—died, did Everhart have a conversation with you about whether or not Clarence Dunning should be killed?   .   .   .   A.   I turned in a board bill against Clarence at McGee's office and it made him mad.   Clarence owed me.

"MR. WARD:   Who is Clarence?

"WITNESS:   Clarence Dunning.

"A.   Everhart told me that board bill was going to cause me or Clarence one to wear a wooden overcoat.   I told him I did not think so, that there was not much danger in him.   He said he would not take any chances if he were me—said if he were me he would get a gun and shoot him and open a knife and throw it down by him and claim self-defense in court."

Appellant denied making the statement testified to by Kieth and was asked what statement was made.   Counsel offered to show by appellant "that he did not say what Kieth says, but that Kieth said to him that—I understand that Dunning claims that he is going to, the first time he sees me, going to take $10 out of my pocket to pay this board bill, and if he undertakes to do that either Dunning or I will wear a wooden overcoat."   This offer was refused and exception saved.

It is apparent that the statements testified by McDole and Kieth were important.   The impression naturally expected to be made on the minds of the jury from the first statement was that appellant

wanted to drive Dunning away from home so as to have a free hand
with his wife, and, from the second, that he was encouraging another
to kill Dunning with a view of getting him out of appellant's way.
The proof offered by appellant, if it had been received by the court
and believed by the jury, would probably have neutralized the damage
done to appellant's case by the testimony of McDole and Kieth.
His bare denial, which he was permitted to make, might not be ac-
cepted, where the jury might have given credence to his version of
a conversation somewhat similar in wording, but widely different in
actual meaning and effect. We think that appellant was entitled to
more than a categorical denial of the statements. He was entitled to
show what the actual conversation was in each instance.

In 22 Corpus Juris, 413, section 497, it is said: "Where an oral
admission of a party has been shown, he is entitled to show the en-
tire statement which was made at the same time, either by cross-exam-
ination of the witness who testified to the admission, or by means of
other witnesses."

To the same effect are Burghart v. Brown, 51 Mo. 600; Howard v.
Newsom, 5 Mo. 523; Reevs v. Hardy, 7 Mo. 348; Lyon v. Batz, 42
Mo. App. 606; Mann v. Weiss, 185 Mo. App. 335, l. c. 345.

While these authorities deal with the right of a party to show the
whole conversation, when only a part of it has been given, we are un-
able to see why the same rule does not apply where a party denies
the statement as testified to, but admits making some statement and
offers to show what the statement really was, which was made.

In Hathaway v. McBride, 198 S. W. (Mo. App.) 1143, it was as-
sumed that a party could explain or vary statements testified to as
having been made by him. The only question considered there was
whether defendant was disqualified as a witness. The third para-
graph of the syllabus reads as follows: "Where testimony was re-
ceived that defendant made certain admissions before witness and
plaintiff's testate, defendant's version of said conversation was
competent."

In Fidelity & Casualty Company of New York v. Dorough, 107
Fed. 389 (C. C. A. Fifth Cir.), it was said: "The defendant having
offered the deposition of Hunter to prove a conversation with R. T.
Dorough, the assured, had in the presence of several other persons
besides the witness, it was perfectly competent for the plaintiff to
prove that no such conversation took place, or that, if the conversa-
tion did take place, it was not such a conversation as was testified
to by the witness Hunter, but varied therefrom or was otherwise
explainable."

In Carver v. United States, 164 U. S. 694, which was an appeal
from a conviction for murder committed in the Indian Territory, the
broad rule was laid down that "where the whole or a part of a con-

versation has been put in evidence by one party, the other party is entitled to explain, vary or contradict it.''

In the case at bar, the State having shown statements made by appellant which were damaging to him, appellant was not restricted to a categorical denial of the statement as testified to by the State's witnesses. He was entitled to deny it altogether or to show what statement actually was made. It was error for the court to refuse to admit the testimony contained in the offer of proof. As the statements shown were damaging, the error in excluding appellant's version of such statements was clearly prejudicial.

Error has been assigned to the court's action in permitting witness Bevel to testify, and in overruling appellant's affidavit of surprise and motion for continuance, after Bevel's name was permitted to be indorsed on the indictment. Error in refusing a new trial on **Unindorsed Witness.** the ground of newly discovered evidence, which it was said would have disproved the testimony of Bevel, is also assigned. As the case must be remanded for another trial and the particular errors thus assigned are of such character that they will not appear again, it is unnecessary to consider such assignments.

On another trial the State can doubtless obviate the objection to the sufficiency of the evidence to prove that the stomach examined by Dr. Bristow was in fact the stomach of deceased. However, we are not prepared to say that the present proof was insufficient. The proof apparently satisfies the test laid down in State v. Smith, 222 S. W. (Mo. Sup.) 455. The testimony of Dr. Harris, connecting the stomach shipped to him by Dr. Jones with the one examined by Dr. Bristow, would remove all possibility of doubt that they were one and the same stomach.

It is necessary to notice only briefly the assignments that the court erred in overruling appellant's objections to hypothetical questions asked of the expert witnesses. In so far as **Hypothetical Question.** the objections made went to the omission of facts from such hypothetical questions, such objections were not good, because the particular omissions were not pointed out. [Kinlen v. Railroad, 216 Mo. l. c. 173; Pennington v. Railway Co., 201 Mo. App. l. c. 487; Jackson v. Kansas City Rys. Co., 232 S. W. (Mo.) 752.]

The objection that the hypothetical question relative to the cause of deceased's death was improperly based upon the assumption that appellant administered poison and that the liquor contained poison, is without merit. It is true there was no direct proof that the liquor in the fruit jar contained poison or that appellant put it there, but there were circumstances tending to show such facts.

Criticisms of the court's instructions might prove to be meritorious upon closer examination. We will merely refer to them. Instruction 1 comes dangerously near assuming facts to be found by the jury. A few "if anys" and "if the jury so finds" would cure any possible error of the sort suggested.

The criticism of Instruction 4 is probably hypercritical, but there is an evident omission of the word "than" which should not be permitted to recur. Instruction 8, on statements made to officers and others by defendant, is in the form repeatedly approved by this court.

There was no error in refusing appellant's instruction which told the jury that proof of illicit relations between appellant and deceased's wife should not be taken as evidence of defendant's guilt of murder. Such testimony tended to show motive for the alleged murder and could properly be considered for that purpose and in that way was evidence tending to show appellant's guilt; but, in the form in which the instruction was asked, it was improper under the record.

Other assignments of error relate to questions which will not likely arise upon another trial and hence need not be noticed now. Because of the error above pointed out, the judgment is reversed and the cause remanded for retrial.

*White, J.,* concurs; *Walker, P. J.,* dissents.