**STATE of Missouri, Respondent,**

v.

**William FOSTER, Appellant.**

**No. 47214.**

Supreme Court of Missouri,

Division No. 2.

Oct. 10, 1960.

Morris A. Shenker, Lawrence J. Lee, Bernard J. Mellman, St. Louis, for appellant.

John M. Dalton, Atty. Gen., John W. Inglish, Asst. Atty. Gen., for respondent.

BARRETT, Commissioner.

Upon a charge of murder in the second degree in shooting and killing Louise Massey the appellant, William Foster, has been found guilty of manslaughter and his punishment fixed at nine years' imprisonment.

This is the background in which Louise came to her death and the context in which some of Foster's claims of error must be considered: William Foster and Louise Massey and her three children, Larry, Linda and Janice, all lived together in a second-floor apartment at 819A Hodiamont Avenue. In the course of the trial Louise was referred to as Foster's "wife" and he was often referred to as "the father" of the children. According to Foster all his pay checks went to Louise and they lived together in peace and harmony as husband and wife. Foster says that he loved Louise and of course did not intentionally shoot her. He says that they lived together as husband and wife for three or four years, "all together" he had been "staying with" Louise "off and on" since 1951, but "We didn't get married because I wasn't—never had get to it." He was the father of little Janice but he was not the father, "Not as I know," of Larry, age 12, or of Linda, age 10. As to his living in their home Linda says, "He came to stay sometimes, but he didn't stay there all the time." She says that she saw "trouble" between Foster and Louise two or three times and, she said, "He sometimes would hit her." Larry said that he had heard Foster threaten his mother, threaten to kill her but "the next morning they was playing." Larry saw Foster hit his mother "one time when they was fighting" and once, "He hit her with a shoe." Foster said, "We had had quarrels. We never had much of a fight. One time she hit me on the head with an um-

brella, and I hit her on the behind with a shoe."

On January 30, 1958, Foster, Louise and the children had dinner in the apartment and about 7:30 Foster went to see the Smarts about a lamp and Louise went to the tavern a half block away. The tavern was a gathering place for Foster, Louise and their friends and two nights a week Louise worked in the tavern as a waitress. Foster returned home about 8:30 and had Larry bring his shotgun, some shells and a bottle of whiskey. His shotgun had been "jamming" and he cleaned it and drank part of a glass of whiskey. Finally he tested "the rejector" with some shells, he was planning to go rabbit hunting on Sunday. He reassembled the gun except for "the locking cap" and left it on the couch loaded with one live shell, number 4 shot. After warning Larry to "not bother with the gun" he went to the tavern where he sat with Louise and their mutual friends. He had, however, but one drink at the tavern and after visiting awhile told Louise he was going on home. She said, "I will be up right after a while." When Foster got to the apartment the children were in bed, he went to the back and "hollered at the dogs, and went on in the front room, and started fooling with the gun." Within fifteen or twenty minutes Louise came home and awakened the children and took them to the bathroom. When she came in the front room she said, "What's wrong with you?" Foster replied, "Nothing." She asked what he was doing with the gun and he told her he was going hunting on Sunday. He says they "did not have a quarrel. We had a discussion" about whether he should go hunting on Sunday. Finally she said, "Don't argue about it and let's go to bed." He said, "O. K., as soon as I get the gun back together" and "I taken the gun, and set it up, and went to put the gun back together, and when I did, it went off," he looked at Louise "and her face was all torn up."

Larry's room was next to his mother's room and he could not see into the front room but he was awake when Foster came home the second time and heard him when he "told the dogs to shut up" and "it sounded like he was clicking the gun" in the front room. After his mother came home he heard her ask "what was wrong" and "He asked my mother what some lady said down to the restaurant, where she worked at." And, he said, "My mother told him she didn't say nothing, but just told her, 'Better play safe and go home.'" The next thing Larry heard was his mother say, "'Don't point it. It might go off'" but "he told her he didn't care." Then he heard Foster say, "'Look at the barrel of it'" and "Then he told my mother he was going to kill her." Larry heard the shot and immediately ran down the steps and to his grandmother's two blocks away.

In connection with Larry's testifying as a state's witness it is claimed that the court erred in unduly restricting the defendant's right to cross-examine him "concerning the conduct and relationship between this witness and the defendant and concerning the reasons for the resentment by this witness toward the defendant." The defendant called as a witness Officer Rice and it is claimed that the court erred in sustaining objections to the officer's testimony relative to prior thefts by Larry, as to his having been apprehended by police officers, "as to his having been placed in the custody of the defendant, and as to the discipline meted out by the defendant upon the witness." The bias or hostility of a witness is never irrelevant, bias, interest and hostility bear on credibility and if denied by the witness may of course be shown, the details of the collateral inquiry being subject to the court's discretion. State v. Pigques, Mo., 310 S.W.2d 942; State v. Winn, Mo., 324 S.W.2d 637; State v. Rose, 339 Mo. 317, 96 S.W.2d 498. But upon this record the defendant's right to cross-examine Larry was not unfairly restricted and his right to prove Larry's hostility and the reasons for it was not improperly limited. As to his resentment of the defendant there was in the first place the anomalous circum-

stances in which Larry was forced to live and to which Foster was indeed a contributing factor. Larry said that he preferred to live with his grandmother and he readily conceded his resentment of Foster and the ostensible reasons for his feeling. On cross-examination he said that "his father" had spanked him twice "a short time before this" (the shooting) and he didn't like it. The spankings were, in the words of defense counsel, to "change your habits." When Foster testified he was permitted to say that with Louise's knowledge he had "whipped Larry about a week before this happened about some money." Thus Larry's feeling of resentment toward the appellant was before the jury and in the circumstances of this record there was no abuse of discretion and the defendant was not unfairly restricted in his right of cross-examination and proof. State v. Winn, supra; State v. McLachlan, Mo., 283 S.W.2d 487.

■ Also in connection with the witnesses and the evidence, the appellant contends that he was improperly restricted in his right of cross-examination and proof in two other respects. When Officer Adelmann arrived at the apartment at 11:30 Foster met him at the top of the stairway. He pointed to the front room and "He said he shot his wife." Officer Berner arrived some time later and took some photographs. During the cross-examination of both Adelmann and Berner the defendant offered to prove that at the police station a statement had been taken from him and that in the statement he had explained or told the officers that he accidentally shot his wife. Also, the appellant called as witnesses two friends, hunting companions, and he offered to prove by them that he had discussed his gun's jamming with them or that one of them knew that the gun jammed and he now says that the exclusion of this testimony, which supported his claim that he was cleaning his gun preparatory to a hunting trip, unjustly deprived him of the right to present material, competent and relevant evidence.

However, Foster was permitted to tell in detail how the gun jammed, that it had previously jammed and that he was cleaning it preparatory to a hunting trip and his testimony as to the jamming of the gun was undisputed although it was in good order when the officers tested it. In addition an expert gunsmith testified in his behalf, told of his experiments and explained how the shotgun could discharge (accidentally) with the "magazine cap" (locking nut) off. The assignment with reference to his written statement and its contents overlooks two important matters; the written statement to the police was given two hours after his verbal statement to Adelmann and the entire written statement was received in evidence and given to the jury. In these circumstances the appellant has not been improperly deprived of his right to present "material, relevant and competent evidence in his own behalf." See and compare: State v. Lovell, 235 Mo. 343, 138 S.W. 523; State v. Dixon, Mo., 190 S.W. 290; State v. Everhart, 316 Mo. 195, 289 S.W. 604; State v. Hamilton, Mo., 310 S.W.2d 906.

The court instructed the jury on murder in the second degree and manslaughter, and upon the appellant's testimony and theory of defense the court instructed and submitted to the jury whether Louise came to her death by accident. It is now claimed that the court erred in instructing the jury on "voluntary manslaughter" for the reason that a voluntary manslaughter instruction was not authorized by the evidence because under the state's theory the defendant was guilty of murder while under the defendant's theory he was not guilty of any crime. A second objection is that if manslaughter was a permissible finding under the evidence the court erred in failing to instruct the jury on manslaughter through culpable negligence.

■ It is not necessary to again review the evidence but obviously the jury could have found the appellant guilty of murder in the second degree. The fact that the evidence supports a finding of murder in

the second degree disposes in part of the appellant's claim of error in instructing the jury on manslaughter; "any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." V.A.M.S., Sec. 556.220; State v. Garrett, Mo., 282 S.W.2d 441, 443; Annotation 102 A.L.R. 1019, 1026. Compare for illustration State v. Bartley, 337 Mo. 229, 84 S.W.2d 637, in which the jury found the defendant guilty of murder in the second degree. In part the appellant's argument is fairly ingenious but it ignores the essential nature of the offense; homicide is a graded offense but manslaughter is a distinct offense, not a degree of murder. 26 Am.Jur., Secs. 17–18, pp. 165–166; State v. Davis, Mo., 34 S.W.2d 133. The statute does not define "voluntary" and "involuntary" manslaughter; "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." V.A.M.S., Sec. 559.070. Voluntary manslaughter is the intentional killing of another (40 C.J.S. Homicide § 40 p. 901) while involuntary manslaughter is the unintentional killing of another while doing some unlawful act not amounting to a felony. 40 C.J.S. Homicide §§ 55, 57, pp. 918, 920. By definition alone Foster's conduct does not fall within the latter definition. There is no claim here that Louise had assaulted Foster or that there was provocation for his shooting her so that he was either guilty of murder or entitled to an acquittal by reason of self-defense, his theory and defense of accidental killing repels any theory of justifiable homicide. Compare State v. Dodson, Mo., 29 S.W.2d 60, 62, and State v. Carroll, 333 Mo. 558, 62 S.W.2d 863. Here the only issue was whether Foster accidentally killed Louise or whether he intentionally shot her. State v. Stringer, 357 Mo. 978, 211 S.W.2d 925. And finally, manslaughter by culpable negligence or any instruction on the subject would not have been a defense but an additional theory upon which the appellant might have been convicted and a finding of guilt on that hypothesis would not have changed the grade of the offense or the punishment. The only possible effect of an instruction on culpable negligence would have been to reduce the offense from second degree murder to manslaughter and the jury has mercifully done that. State v. Francies, Mo., 295 S.W.2d 8.

◼ The indictment is in proper form and appropriately includes the offense of manslaughter (V.A.M.S., Sec. 559.070), the verdict is in proper form and responsive (V.A.M.S., Sec. 559.140) and since the assignments of error briefed by the appellant are without merit (Sup.Ct. Rule 28.02) the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.