In the Matter of the **ESTATE** of
**Julius LASPY, deceased.**

**Barbara Jean McCALLOP, nee Mason,
Administratrix-Respondent,**

v.

**Elsie Mae LASPY, Claimant-Appellant.**

**No. 24542.**

Kansas City Court of Appeals.

Missouri.

Dec. 5, 1966.

Rufus Burrus, Independence, for appellant.

Downey, Sullivan & McCormick, Kansas City, for respondent.

CROSS, Presiding Judge.

On January 1, 1955, Elsie Mae Laspy shot and killed her husband, Julius Laspy. Thereafter she filed claim against his es-

tate under Section 474.250 V.A.M.S. for a widow's allowance in money for one year's maintenance and for $400.00 in cash in lieu of specific personal property. From an adverse judgment of the probate court, claimant appealed to the circuit court.

Upon trial de novo it was stipulated by appellant and respondent administratrix that claimant Elsie Mae Laspy is the widow of Julius Laspy, deceased, and that they were living together as husband and wife at the time of his death.

Pursuant to offer on behalf of the estate the court received in evidence the record of claimant's final conviction "for manslaughter in the death of her husband, Julius Laspy", in the case of State v. Laspy, affirmed by the Supreme Court of Missouri, 323 S.W.2d 713, reference to which shows that she was tried three times by a jury in Jackson County on an information charging her with first degree murder. The first trial resulted in a conviction for second degree murder which was set aside by the trial court. The second trial resulted also in a judgment of conviction for second degree murder which was reversed on appeal. Upon her third trial she was convicted of manslaughter and sentenced to a term of ten years' imprisonment in the penitentiary. The cited Supreme Court opinion affirming the manslaughter conviction contains a meager recital of facts and refers to the opinion in her prior appeal reported in 298 S.W. 2d 357 for a more complete statement of facts. From these sources we learn that claimant admittedly shot and killed her husband about 6:15 A.M., on January 1, 1955. The shooting climaxed an all night New Year's party in the Laspy home in Independence, which was attended by numerous people, as the party was in process of breaking up. The tragedy seems to have grown out of the husband's resentment over claimant's failure to lock the bathroom door when she entered therein. According to her testimony Laspy cursed her and kicked her in the stomach, procured a pistol, waved it in her face and threatened to kill her. Soon after, in their bedroom, Laspy again cursed

and threatened to kill her, and then turned and reached into the closet. As he did so claimant picked up a pistol lying on the bed and shot him at least three times in rapid succession. He died almost immediately. Claimant testified she shot him in self defense because she thought he was reaching for a gun to kill her with.

During trial of the claim for allowances in circuit court an offer was made on claimant's behalf to show the nature and value of the estate, and the salary of decedent, as bearing on the amount of the maintenance allowance she should receive. Additionally claimant was tendered as a witness offering to testify that she shot and killed her husband "in defense of herself, in fear of being shot herself, in self defense". These offers were both refused.

The trial court found (1) that claimant was the wife of Julius Laspy at the time of his death on January 1, 1955, (2) that claimant caused his death by shooting, for which homicide she was tried and convicted of the crime of manslaughter, (3) that the conviction had been appealed to and affirmed by the Supreme Court, and (4) that claimant has been released from penal confinement "after commutation of sentence and/or parole". Upon those findings the court rendered judgment denying appellant's claim for allowances on the ground that "the Applicant (appellant herein) caused the death of her deceased spouse and should not be permitted to recover her allowance for one year's support or for additional personal property by reason of the commission of said crime for which she was convicted, and that Applicant should not be permitted to profit by reason of her own wrong, or to base any claim or to acquire property by reason of the commission of such crime". From that judgment claimant appeals.

The primary issue in this case is whether a wife who feloniously kills her husband will be permitted to take from his estate the property and allowances provided by statute for surviving widows. Appellant

presses this court to rule that her conviction for the crime of manslaughter does not affect her right as a surviving spouse to receive support for one year. It is argued on her behalf that Section 474.260 as amended in 1957, clearly provides for such allowance and contains no exception that it shall be denied "because of any manslaughter conviction of the surviving spouse"; that even if by prior court decisions it had been the rule that a person who murdered his spouse thereby forfeited his rights to inherit her property, such court construction cannot be read into Section 474.260 as re-enacted in 1957, without specific inclusion therein; and, that since the probate code by Section 474.140 RSMo 1959, V.A.M.S., does in fact make certain exclusions whereby a spouse forfeits inheritance and statutory rights by reason of misconduct,[1] but provides no exclusion for homicide, it is to be considered that the legislature intended there be no denial of marital rights because of that crime, and that thereby the legislature repudiated court decisions to the contrary. These arguments are without merit and stand in conflict with prevailing authority herein to be noted.

In 1908 the Supreme Court rendered a landmark decision on these questions in the case of Perry v. Strawbridge, 209 Mo. 621, 108 S.W. 641, 16 L.R.A.,N.S., 244. The court there decided that a husband, who killed his wife without legal justification or excuse, and three hours later killed himself, could not inherit the portion of her estate otherwise given to him by the statutes of inheritance, and that hence his children took no interest therein. In a comprehensive and superbly reasoned opinion by Judge Graves it was pointed out that

Missouri statutes of descent and distribution were borrowed largely from the common law and are generally expressive of the common law; and that, furthermore, when we adopted the common law, as we did in 1816, and in later reiterative adoptive statutes, we took the body of all the common law applicable under our state and federal constitutions, and that such is the law of this state, except where repealed, changed or modified by statute. Pertinent illustrative portions of the opinion are here quoted:

"In the case of Box v. Lanier, 112 Tenn. [393], 1. c. 409, 79 S.W. [1042], 1045, 64 L.R.A. 458, the Supreme Court of Tennessee said: 'It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted by public policy, and have their foundation in universal law administered in all civilized countries." These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in textbooks and in reported cases. Without their recognition and enforcement by the courts, their judgments would excite the indignation of all right-thinking people. The first of these maxims is applied in order to prevent one from taking the benefit of his own fraud. Why should not the last be enforced so as to forbid a party receiving the fruits of his own crime?

---

1. Section 474.140 RSMo 1959, V.A.M.S., provides: "If any married person voluntarily leaves his spouse and goes away and continues with an adulterer or abandons his spouse without reasonable cause and continues to live separate and apart from his spouse for one whole year next preceding his death, or dwells with another in a state

of adultery continuously, or if any wife after being ravished consents to her ravisher, such spouse is forever barred from his inheritance rights, homestead allowance, exempt property or any statutory allowances from the estate of his spouse unless such spouse is voluntarily reconciled to him and resumes cohabitation with him".

"And Earl, J., for the New York court of last resort, in (Riggs et al. v. Palmer et al., 115 N.Y. [506], 1. c. 511, 22 N.E. 188, 190, 58 L.R.A. 340), * * * said: 'Besides, all laws as well as all contracts may be controlled in their operation and effect by general, fundamental maxims of the common law. No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, *or to acquire property by his own crime.* These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes.' * * *

* * * * * *

" 'Under the civil law evolved from the general principles of natural law and justice by many generations of jurisconsults, philosophers, and statesmen, one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered. * * * But so far as I can find, in no country where the common law prevails had it been deemed important to enact a law to provide for such a case. Our revisers and lawmakers were familiar with the civil law, and they did not deem it important to incorporate into our statutes its provisions upon this subject. This is not a casus omissus. It was evidently supposed that the maxims of the common law were sufficient to regulate such a case, and that a specific enactment for that purpose was not needed.'

"These maxims of the common law are expressly made a part of our laws by the statutes of this state, first adopted in 1816, as we have hereinabove indicated. They are a part of the law of the state by force of section 4151, Rev. St. 1899, unless they have been repealed, changed, modified, or wiped out by statute law. Have we by statute either expressly or impliedly changed or modified the maxims discussed in the Tennessee and New York cases, supra? Has the common law in this respect been repealed, changed, or modified? We think not. If not, they are a part of our law. If not, then this statute must be read in connection therewith, and when so read the father of appellees acquired no interest in the estate in controversy, and appellees have none.

* * * * * *

"To our mind our statutes of descents and distributions are so largely expressive of the common law that we must consider these maxims and the whole body of the applicable common-law doctrines; that we must read them together as parts and parcels of the same system, and when so read there can be but one answer to the query suggested by the facts of this case.

"For these considerations alone, we think this case should be reversed, (denying the inheritance) but we take up next a discussion of this statute."

The "discussion of the statute" above referred to in the Perry opinion was in response to the contention there made on behalf of claimants, as it is also made in the instant case, that the right of inheritance was provided and governed solely by the applicable statutes of descent and distribution, strictly in accordance with the plain language incorporated therein, regardless of what the rule may have been at common law; that the statute alone establishes the rule of descent and distribution, unaffected by any criminal act of the heir or distributee. The court's answer to this argument was that statutes should be read in the light of the common law, without presumption that the legislature intended to make any innovation upon the common law further than the case absolutely required, and that no court should be inclined to other than a construction which would make the statute comport with reason and fundamental maxims of the law. Concluding its

construction of the statute in question, the court said:

"In fact, the pathway of judicial literature from the earliest period down to the present is literally strewn with cases which, like beacon lights, have guided the hand of justice in preventing unjust, unrighteous, absurd, unreasonable and abhorrent results from the use of general words and expressions in statutes. To cite and quote more would be but to become tedious. We have gone thus far on account of the newness of the particular question of this case. Under these authorities we should not, and will not, hold that 'widower' as used in section 2938, supra, means one who has created a condition by murderous hands and heart. This case is without the statute. 'Widower' as there used means one who has been reduced to that condition by the ordinary and usual vicissitudes of life, and not one who, by felonious act, has himself created that condition".

■ The principles established by Perry v. Strawbridge are still the law of this state and have been followed and reaffirmed by all succeeding Missouri cases involving the questions there decided, including Grose v. Holland, 357 Mo. 874, 211 S.W.2d 464; Barnett v. Couey, 224 Mo.App. 913, 27 S.W.2d 757; Eisenhardt v. Siegel, 343 Mo. 22, 119 S.W.2d 810 and Hopkins v. Metropolitan Life Insurance Co., Mo.App., 151 S.W.2d 527.[2] Thus it is clear that in this case we must apply the rule that "no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his iniquity, or to acquire property by his own crime". Section 474.140 must be construed in the light of the foregoing maxim and in accordance with the rules of statutory construction delineated in Perry v.

Strawbridge, so that claimant may qualify as a "widow" within the purview of that statute, entitled to its benefits, only if she has been "reduced to that condition by the ordinary and usual vicissitudes of life" and not by a felonious act which created that condition.

■ Claimant undertakes to avoid the effect of Perry v. Strawbridge by arguing that the crime which disqualified the killer from inheritance in that case was murder, whereas claimant's crime in this case was only manslaughter; that malice is an essential ingredient of murder, premeditation a necessary element of murder in the second degree, but that neither malice nor premeditation is a necessary element of manslaughter. Therefore, says claimant, since neither malice nor premeditation accompanied the slaying of her husband, Perry v. Strawbridge cannot be considered as authority for denying her widow's allowance under the statute. We do not accept the foregoing as valid reasons for distinguishing murder and manslaughter as causes to forfeit the statutory allowance. Our Supreme Court indicated in Perry v. Strawbridge that it would make no such distinction by incorporating in the opinion the following quotation from Wharton on Homicide, 3rd Ed., Sec. 665, which the court characterized as a terse statement of the common law rule: " 'To permit a person who commits a murder, or any person claiming under him, to benefit by his criminal act, would be contrary to public policy. And no devisee can take under the will of a testator whose death has been caused by the criminal and felonious act of the devisee himself. And, in applying this rule, no distinction can be made between a death caused by murder and one caused by manslaughter.' "

We accept Wharton's statement with some qualification and necessary distinction

---

2. See 23 Am.Jur.2d, Descent and Distribution, Sec. 94, p. 838, where it is stated that "It is generally, if not universally true that a potential heir or distributee who feloniously brings about the death of his intestate will not be allowed to take and enjoy the property of the person so killed".

between the various crimes that are denoted in this state as manslaughter. Section 559.070 defines manslaughter as "every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide." Although the statute does not define voluntary and involuntary manslaughter, the courts still continue to distinguish between these offenses "in that the former embraces an intentional killing, (40 C.J.S. Homicide § 40) while the latter extends to an unintentional killing while culpably negligent (Id. Sections 55, 62)." State v. Elgin, Mo.Sup., 391 S.W.2d 341. Also see State v. Foster, Mo.Sup., 338 S.W.2d 892. Other statutes provide that it shall be manslaughter when death results from abortion, from a mischievous animal unlawfully suffered by its owner to go at large, from the ministrations of an intoxicated physician, and from the wilful or negligent operation of unsafe steamboats or railroad trains.

■ Well reasoned authority, more fully referred to later herein, holds that whether a particular act of manslaughter should or should not be held to bar the killer from enjoying the fruits of his crime hinges upon whether it was perpetrated with or without criminal intent, a quality which is defined as "an intent to do, knowingly and willfully, that which is condemned as wrong by the law and the common morality of the country". 22 C.J.S. Criminal Law, § 1, p. 7. The judgment convicting claimant of manslaughter was entered on a verdict from a jury which, under the court's instructions, found that "defendant herein, Elsie Mae Laspy wilfully and feloniously * * * shot and killed the said Julius Laspy * * *". This finding was made under a defining instruction which told the jury that, " 'Wilfully' means intentionally, not accidentally", and that " 'feloniously' means wickedly and against the admonition of the law, that is, unlawfully". Therefore, the manslaughter crime for which claimant stands convicted has been judicially determined to be *intentional*—that

is, not accidental or the result of culpable negligence. We bear in mind that the real reason underlying the decisions in adjudicated cases denying claims against the decedent's estate and claims to recover benefits from his life insurance is that the killer *intentionally* took the life of the ancestor or the insured and that the intentional act should not place the miscreant in position to enjoy a benefit which might never have been available to him except for the wicked intentional killing. Such reasoning which has controlled in murder cases applies equally well to the instant case, because claimant's crime of manslaughter was the *intentional* shooting and killing of her husband. This being so, the law operates to bar her from receiving any benefit from his estate. This expression is not to be interpreted that we would so rule in cases involving unintentional, accidental, involuntary manslaughter or manslaughter caused by culpable negligence.

These views are amply supported by substantial authority. For a comprehensive discussion of the distinction properly to be made between intentional manslaughter and unintentional manslaughter as a bar to recovery of benefits made possible by the crime itself, see Metropolitan Life Insurance Co. v. McDavid (D.C.Mich.), 39 F. Supp. 228, where a widow who intentionally shot and killed her husband was convicted of voluntary manslaughter and thereby was held to forfeit all rights in his life insurance proceeds and his estate. In the Texas case, Greer v. Franklin Life Insurance Co., 148 Tex. 166, 221 S.W.2d 857, the court construed a Texas statute, the terms of which "eliminate the interest of the beneficiary in favor of 'the nearest relative of insured' where the beneficiary 'willfully' brings about the death of the insured". Viewing the statute as a general restatement of the common law, the court interpreted it in the light of the common law to mean that an intentional, unlawful killing of the insured by the beneficiary, not in self defense, required forfeiture of the beneficiary's interest. In so doing the court stated that the word "willfully" does

not in substance mean "maliciously". Applying the statute so construed to the facts in the case the court ruled that a wife who stabbed and killed her husband and pleaded guilty to the charge of murder *without malice* thereby forfeited her beneficial interest in the proceeds of his life insurance, even though the killing was done under the *immediate influence of sudden and violent passion from an adequate cause.* Relying strongly upon the McDavid case in reaching its result, the court said:

"Among the common law authorities heretofore mentioned, including the Restatement, the rule is sometimes expressed in terms of the crime of 'murder,' and there is some confusion of opinion where the conduct of the beneficiary amounts only to 'manslaughter.' Metropolitan Life Ins. Co. v. McDavid, supra; Appleman, Insurance Law and Practice, supra; see also 20 Tex.L.Rev. supra, p. 239; 49 Harv.L.Rev. supra, p. 722. One of the best considered opinions we have examined on the subject as appertaining to the instant situation is that of the McDavid case last above cited, in which upon a careful review of the authorities, it was held that where the beneficiary intends to kill the insured and the killing is illegal, the beneficiary loses his or her rights under the policy, even though the killing was done under the immediate influence of sudden and violent passion from an adequate cause. We consider that decision a sound expression of the common law. The principle that one shall not profit by his (or her) own wrong has, of course, its limits, as evidenced by the refusal of courts to bar the beneficiary in cases of negligent homicide or 'involuntary manslaughter' * * *".

Also see United States v. Foster (D.C. Mich.), 238 F.Supp. 867, where a widow who was beneficiary of her husband's life insurance pleaded guilty and was convicted on the charge of manslaughter—a crime defined in the jurisdiction of its commission as "murder without malice". The conviction was held to bar her from recovering the policy proceeds.

Claimant's brief presents one more assignment: that the trial court erred in refusing her offer to prove she shot her husband in self defense. She argues that the judgment convicting her of manslaughter is not res judicata of the self defense issue because the parties here are not the same parties present in the criminal action and that therefore the court should have heard additional evidence on the issue. The respondent submits that claimant's conviction of manslaughter is competent evidence in the instant civil controversy, is conclusive of the issues involved, and that the trial court properly excluded evidence offered by claimant to show that the homicide was in self defense and therefore justifiable.

■ There has been much contrariety of judicial opinion as to the admissibility and effect of a conviction or acquittal in a criminal case, as evidence, in a civil case, of the facts upon which it was based. The earlier cases generally observed a rule to the effect that a judgment in a criminal case, whether of conviction or acquittal, was incompetent and should be excluded when offered in a civil case to prove the facts upon which it is based. Courts following that rule advanced various reasons to support it—all of which have been severely criticized.[3] One frequently stated reason was to the effect that the issues, objects and procedures involved in criminal trials were different from those in civil cases. This argument was weakened with the passage of time and the development of substantive and procedural safeguards which afford the accused a more favorable opportunity to prevail on an issue of fact in a criminal trial than in a civil proceeding—for example, the presumption of innocence attending the accused, the necessity

---

**3.** 39 Va.L.Rev. 995 (1953); 41 Harvard L.Rev. 241 (1927); 12 Minn.L.Rev. 546 (1928); 10 Rocky Mt.L.Rev. 282 (1938).

of proving his guilt beyond a reasonable doubt, construction of statutes in his favor, and his privilege of refusing to testify. Another frequently asserted reason for the exclusion rule was that the parties to the criminal case and a derivative civil proceeding lacked mutuality, and that consequently there was no mutuality of estoppel. This objection arose from the common law concept that a transaction between two parties ought not to disadvantage a third party who has not had his day in court. Broom's Legal Maxims 648 (10 Ed.Kersley, 1939). However, it does not appear reasonable that this rule would be violated by admitting evidence of a prior criminal conviction in a civil suit brought by the convict against the third party, since the admission of the judgment of conviction would operate to the advantage rather than to the disadvantage of the third party who offers it. Missouri courts have uniformly held that a criminal judgment may not be admitted in a civil case as evidence of the facts determined in the criminal case. Sklebar v. Downey, Mo.App., St. Louis, 1926, 220 Mo.App. 5, 285 S.W. 148; Summers v. Rutherford, Mo.App., Springfield, 1917, 195 S.W. 511; Myers v. Maryland Cas. Co., Mo.App., Kansas City, 1907, 123 Mo.App. 682, 101 S.W. 124. We note, however, that each of the cited Missouri cases involved a civil proceeding brought *against* the convicted defendant to recover damages for acts previously determined to be unlawful by the criminal judgment. As will be more fully developed hereinafter, we believe that this same rule does not and should not apply in a civil action brought *by* the convicted defendant for the purpose of profiting from his criminal conduct.

■ It is the present tendency of courts to abandon any such general rule applicable to all criminal judgments and to resolve the question of admissibility from the point of view of the particular judgment offered as evidence. 18 A.L.R.2d 1288, Anno. Conviction or Acquittal as Evidence; Mineo v. Eureka Security Fire & Marine Ins. Co., 182 Pa.Super. 75, 125 A.2d 612;

Connecticut Fire Ins. Co. v. Ferrara, 8 Cir., 277 F.2d 388. This is a reasonable approach to the problem because, for example, the rule as to the admissibility of a beneficiary's conviction for the murder of an insured in an action on the policy may conceivably differ from that governing admissibility of a traffic violation conviction in a negligence action or a conviction for assault and battery. The courts have been particularly apt to accept criminal convictions as evidence of the facts upon which they are based "where the convicted criminal attempts, in a civil action, to reap the fruits of his own criminal acts". See 18 A.L.R.2d 1288, Anno. That Missouri courts might receive criminal convictions as evidence in such cases was inferentially forecast by this court in Osborn v. Gibson, Mo.App., 309 S.W.2d 15, where we said, "Most of the leading cases approving of the admission, in civil actions, of a previous criminal conviction as evidence of the facts upon which it was based, have involved situations where the convicted criminal has sought to take advantage of rights growing out of the criminal act. 18 A.L.R.2d 1300". Since the case before us is of that precise nature, we believe the exception to the general rule of exclusion should be applied, that the record of claimant's conviction is competent evidence on the issues, and that its admission by the trial court was the proper course of judicial action. We rule accordingly.

■ Thus we come to the problem: what evidentiary effect is to be accorded a judgment of conviction when it is received as evidence in a civil action in which the person convicted seeks to enforce a right arising from the crime? The courts are at variance on the question. On the one hand, a majority of courts have regarded the prior conviction, when admitted, as only prima facie evidence of the facts adjudicated by the criminal proceeding. Anno: 18 A.L.R.2d 1288. The leading authority expounding this view is the often cited case of Schindler v. Royal Ins. Co. (1932), 258 N.Y. 310, 179 N.E 711, 80 A.L.R. 1142.

Apparently, however, in that case the New York court reached its conclusion with reluctance. In an equivocal and divided opinion it was strongly intimated that probably the sounder view would be that a judgment of criminal conviction should be conclusive, but that the court was constrained by established precedents to refrain from so ruling. Suggesting that the legislature could nullify existing authority by enacting that all convictions shall be *conclusive* evidence of the guilt of the convicted person in any proceeding, civil or criminal, whoever may be parties, the opinion concedes that "The court might so decide were the occasion imperative and the necessity clear, but established precedents are not to be lightly set aside, even though they seem archaic". Opinion has been expressed to the effect that the Schindler decision was an expedient compromise between "the extremes of exclusion—the traditional rule, and conclusiveness—a logical but radical departure therefrom", 39 Va.L.Rev.1953, p. 995—Note—Admissibility and Weight of a Criminal Conviction in a Subsequent Civil Action.

On the other hand there is substantial authority holding that the judgment of conviction is conclusive of the facts adjudicated. Although this is the minority view, numerically and historically, we believe the trend of decisions is in that direction. Apparently the first decision to rule that the criminal conviction was conclusive in a subsequent civil action was rendered in the Virginia case, Eagle, Star & British Dominions Ins. Co. v. Heller (1927), 149 Va. 82, 140 S.E. 314, 57 A.L.R. 490, where the court held that an insured's conviction of wilfully burning his property conclusively barred his recovery of benefits under a fire insurance policy. Inasmuch as Heller is the pioneer and still the leading case on the doctrine it announced, we quote at some length from the opinion:

"While the judgment in the criminal case is not res judicata as to the company, and while it does not operate technically as an estoppel on the plaintiff, because of lack of mutuality, the insurance company, not being a party thereto, nevertheless, lest the reasons for the rule be overlooked, it should be remembered that the plaintiff in error, Heller, was a party to the criminal case, that he there had the fullest opportunity to make all of his defenses, that the identical question which he has reopened in this case was solemnly adjudicated in that case, and that it was there found beyond a reasonable doubt that he had burned his property for the purpose of collecting the insurance from this insurance company. Therefore he should not be permitted again to raise that question by this collateral attack upon that judgment, and thus to avoid its legal and logical consequences.

\* \* \* \* \* \*

"To permit a recovery under a policy of fire insurance by one who has been convicted of burning the property insured, would be to disregard the contract, be illogical, would discredit the administration of justice, defy public policy and shock the most unenlightened conscience. To sustain such a judgment would be to encourage and give support to the current thoughtless and carping criticisms of legal procedure, and to justify the gibe that the administration of the law is (the) only remaining legalized lottery.

"Our conclusion, then, under the facts of this case, is that the court erred in refusing to admit evidence of the conviction; that, when admitted, the precise finding of fact, that the accused was criminally responsible for the fire, unquestionably incendiary, which destroyed his goods, is conclusive upon the plaintiff, Heller; that this judgment of a court of competent jurisdiction was a determination of that particular and decisive fact as against him; that this judgment cannot be attacked except upon the ground of fraud, perjury, collusion, or some other such ground of invalidity; and that when so admitted in evidence there could have been but one proper

verdict, and that a verdict for the defendant. We shall, therefore, reverse the judgment in favor of the plaintiff and enter judgment here in favor of the defendant".

The Heller case was followed by the Illinois case, Austin v. United States (1942), 7 Cir. 125 F.2d 816, a suit to recover life insurance benefits by a war risk insurance policy beneficiary who had been convicted of murdering the insured—her husband. Quoting from and relying upon the Heller opinion, Diamond v. New York Life Ins. Co., 7 Cir., 50 F.2d 884, 886, and Burt v. Union Central Life Ins. Co., 187 U.S. 362, 23 S.Ct. 139, 141, 47 L.Ed. 216, the court held that the judgment of conviction imported verity, was not subject to collateral attack and was a conclusive bar to a recovery by the convicted plaintiff in her civil suit. Another leading authority holding that the prior criminal conviction was a conclusive bar to a civil action on the same facts is the previously cited Pennsylvania case, Mineo v. Eureka Security Fire & Marine Ins. Co., 182 Pa.Super. 75, 125 A.2d 612. There, likewise as in Heller, convicted arsonists sought recovery of fire insurance indemnity for the loss of the property. The Pennsylvania court, relying principally upon the Heller case from which it quoted at length, held that the judgment of criminal conviction rendered against the insureds was conclusive and barred recovery under the policy. The court said:

"This rule is founded upon the public interest which requires that the laws against crime be enforced, and that courts aid no man in any effort he may make to benefit from his own violation of them. The rule is enforced upon the ground of public policy alone and not out of consideration for the defendant to whom the advantage is incidental.

\* \* \* \* \* \*

"Whether the insureds set the fire or not is a question of fact which has been established beyond a reasonable doubt in a court proceedings. Once this fact has been established, and the Commonwealth, in whose hands rests the maintenance of public policy, has satisfied itself of the fact, why then should it permit its courts to be used by the insured in an effort to obtain reward for the crime which the Commonwealth has already concluded he has committed?"

A case of particular persuasion that the "conclusive" rule should be followed by Missouri courts is Connecticut Fire Ins. Co. v. Ferrara, 277 F.2d 388—a Missouri case decided by the United States Court of Appeals, Eighth Circuit. As in Heller and Mineo, the suit arose upon a fire insurance claim by an insured under criminal conviction for burning the property. Considering but not ruling the question whether the conviction should be accepted only as additional evidence or held to be an automatic and conclusive bar to the civil action, the court acknowledged that the first stated alternative was the one followed by the numerical majority of decisions, but clearly expressed disapproval of such a rule. The court said:

"Nonetheless, the reasoning of Austin v. United States, supra, (125 F.2d 816); Mineo v. Eureka Security Fire & Marine Ins. Co., supra; and Eagle Star & British Dominions Ins. Co. v. Heller, supra, wherein the criminal conviction was held conclusive of the civil issue, is persuasive for, if public policy demands that a criminal be not allowed to profit by his crime and considering the fact that the criminal judgment was based upon a burden of proof requiring guilt beyond a reasonable doubt, there seems little justification for allowing the civil tribunal to reach a conclusion inconsistent with that policy".

Other cases following the "conclusive" rule as exemplified by the cases we have previously cited, quoted from and commented upon include Poston v. Home Insurance Co., 191 S.C. 314, 4 S.E.2d 261, 123 A.L.R. 1451; Teitelbaum Furs Inc. v. Dominion Ins. Co., 58 Cal.2d 601, 25 Cal.Rptr. 559,

375 P.2d 439; and Taylor v. Taylor, 257 N.C. 130, 125 S.E.2d 373.

■ The foregoing authorities are soundly reasoned and convincingly persuasive that the "conclusive" rule should be applied under the circumstances which are present in this case. We take that course and hold that the judgment of claimant's criminal conviction shall be accepted as conclusive evidence in this civil suit that the killing of her husband was not done in self defense, was legally unjustifiable, and was an intentional manslaughter—hence, a crime that bars her from any benefit arising out of her victim's estate, and that she is collaterally estopped by that judgment from further consideration of the issues it determined. This ruling is founded on the same principles of public policy enunciated in Heller, Mineo, Ferrara, and other cases above noted which require that laws against crime be enforced, that a miscreant be not allowed to profit by his crime, and that courts aid no man in any effort to do so.

■ It may be conceded to claimant that the judgment in the criminal case is not res judicata in its strictly technical sense because the "mutuality of parties" that tradition has generally regarded as an essential of the rule is not present—the estate not having been a party to the criminal case. Nonetheless, the absence of mutuality of parties is no deterrent to our application of the rule of collateral estoppel by criminal judgment which precludes relitigation of issues previously determined in the criminal case, as the courts have done in the Heller case and in the cases which have followed its reasoning. In fact, "collateral estoppel" is recognized as but an *aspect* or *refinement* of the general rule of res judicata. See cases digested in 7A Words and Phrases, Collateral Estoppel. The concept of mutuality of estoppels has undergone recent reappraisal by the U. S. Circuit Court of Appeals, 2d Circuit, in reviewing the consolidated cases of Zdanok et al. v. Glidden Co., Durkee Famous Foods Division, and Alexander et al. v. Glidden Co., Durkee Famous Foods Division (2 Cir.1964), 327 F.2d 944. The cited cases were actions by separate groups of union members seeking redress from their common employer for its alleged violation of a collective bargaining agreement. Upon final appeal the reviewing court held that a prior determination of issues resulting from trial of the Zdanok case, where the parties had full opportunity to litigate them effectively, was conclusive upon the defendant Glidden in the subsequently tried Alexander case, and precluded Glidden from introducing additional evidence on the issue of its liability to the Alexander plaintiffs who had not been parties to the prior action but were seeking relief from defendant on the same grounds of liability successfully asserted against it by the plaintiffs in the Zdanok case. The court stated that the reason for its ruling "lies in the principle somewhat undescriptively called 'collateral estoppel' ". Acknowledging that such a result would have seemed impossible fifty years ago, Judge Friendly further commented:

"This doctrine of the need for mutuality of estoppels, criticized by Bentham over a century ago as destitute of any semblance of reason, and as 'a maxim which one would suppose to have found its way from the gaming-table to the bench,' ibid. fn. 14, has been much eroded in recent years. Perhaps the leading federal decision is Judge Hastie's in Bruszewski v. United States, 181 F.2d 419 (3 Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950), which this court followed in Adriaanse v. United States, 184 F.2d 968 (2 Cir. 1950), cert. denied, 340 U.S. 932, 71 S.Ct. 495, 95 L. Ed. 673 (1951). We see no purpose in multiplying citations since it is recognized that the widest breach in the citadel of mutuality was rammed by Justice Traynor's opinion in Bernhard v. Bank of America, 19 Cal.2d 807, 811–813, 122 P.2d 892, 894–895 * * *. Having explained why 'The criteria for determin-

ing who may assert a plea of res judicata differ fundamentally from the criteria for determining against whom a plea of res judicata may be asserted,' and that there is 'no compelling reason * * * for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation,' he said:

'In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?' "

The foregoing criteria suggested in the Bernhard case appear to be logically founded. Applying them to the situation in the present case, and answering the three questions propounded in the test, the result comes out like this: (a) The issue decided in State v. Laspy was the identical issue presented in the instant civil claim, (self defense); (b) there was a final judgment on the merits (conviction for manslaughter); (c) Elsie Mae Laspy, against whom the present plea of estoppel is directed, was a party to the prior adjudication (defendant in State v. Laspy). Therefore, if the rule of res judicata should be accepted as it is recognized and applied by Bernhard, Zdanok and cases cited in those authorities, it might be said that claimant is barred from litigating the issues here by the application of res judicata. It is not necessary, however, for us to engage further in semantics in exploration of that possibili-

ty. It is sufficient to say that claimant is barred by collateral estoppel resulting from the criminal judgment and to base that holding on the Heller doctrine.

Claimant has had her day in court. Three separate trials have extended her more than ample opportunity to establish the facts she would now relitigate. Three separate juries have weighed evidence bearing upon the merits of her plea that she killed her husband in self defense. Each jury rejected that defense and found her guilty of a wilful, felonious homicide, beyond a reasonable doubt. The judgment of conviction entered upon the third and final verdict has been reviewed and affirmed by Missouri's court of last resort. No attack can be made upon it except on the ground of fraud, perjury, collusion or some other kindred species of vice or error sufficient to upset the conviction itself, and then only by a separate, direct proceeding instituted for that specific purpose. The judgment is immune from collateral attack here.

The patient processes of the law have finally established as a particular and decisive fact, beyond a reasonable doubt and to the satisfaction of the state, that claimant Laspy feloniously and intentionally killed her husband *without legal justification*. To open this question to inquiry again, in a civil forum where she might prevail and take from her victim's estate a bounty made possible only by her crime, would indeed shock the public conscience, engender disrespect for courts and generally discredit the administration of justice.

The judgment is affirmed.

All concur.